PLANNED PARENTHOOD of the
COLUMBIA/WILLIAMETTE,
INC.; et al., Plaintiffs,

v.

AMERICAN COALITION OF
LIFE ACTIVISTS; et
al., Defendants.

Civil No. 95–1671–JO.

United States District Court,
D. Oregon.

Sept. 18, 1996.

Stephen S. Walters, Stoel Rives, Portland, OR, Maria T. Vullo, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, Roger K. Evans, Legal Action for Reproductive Rights, Planned Parenthood Federation of America, Inc., New York City, for Plaintiffs.

William D. Bailey, Bailey & Wolfe, Portland, OR, David T. Daulton, Berean Law Group, P.C., Norfolk, VA, Mark Belz, Belz & Jones, P.C., St. Louis, MO, Norman L. Lindstedt, Lindstedt Buono & Gordon, Portland, OR, Michael P. Tierney, John M. McSherry, Legal Center for the Defense of Life, New York City, Chris Ferrara, American Catholic Lawyers Association, Fairfield, NJ, for Defendants.

Michael H. Simon, Andrew J. Bowman, Chin See Ming, Perkins Coie, Portland, OR, for Amicus Curiae.

## OPINION AND ORDER

ROBERT E. JONES, District Judge:

Plaintiffs filed this lawsuit against Defendants,[1] alleging violations of the Freedom of

---

1. "Plaintiffs" include two not-for-profit corporations and several individual Plaintiffs: Planned Parenthood of the Columbia/Willamette, Inc. ("Planned Parenthood"), Portland Feminist Women's Health Center ("Portland Feminist"), Robert Crist, M.D., Warren Hern, M.D., Elizabeth Newhall, M.D., James Newhall, M.D., and Karen Sweigert, M.D.. The two corporate Plain-

Access to Clinics Act of 1994 ("FACE"), 18 U.S.C.A. § 248 (1996), the Racketeer Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. § 1962 (1988), Oregon RICO ("ORICO"), Oregon Revised Statutes ("ORS") 166.720 (1995), and Oregon state tort law. This action is before this Court on Defendants' Motion to Dismiss Plaintiffs' Complaint (# 103, # 104, # 112), and Motion for Judgment on the pleadings (# 114).

### FACTUAL ALLEGATIONS

Plaintiffs allege that the Individual Defendants formed the American Coalition of Life Activists ("ACLA") with the intention to use "harassment, intimidation and threats of violence in order to cause violent acts and to drive plaintiffs out of business." Compl. ¶ 38. ACLA causes violent acts primarily through publication of "wanted" or "unwanted" posters which mimic law enforcement posters seeking the arrest of criminals. *Id.* ¶ 39. Specifically, in January 1995, ACLA and the Individual Defendants released a "wanted" poster (the "Deadly Dozen List") which listed names, home addresses, and some telephone numbers of thirteen physicians, including three Plaintiffs Hern, Elizabeth Newhall, and James Newhall, who perform abortions. *Id.* ¶ 40–41, Ex. A.

The Deadly Dozen List states that the individuals listed are "Guilty of Crimes Against Humanity" and offers a "$5,000 Reward for information leading to arrest, conviction and revocation of license to practice medicine." *Id.*, Ex. A. Plaintiffs claim that the Deadly Dozen List "suggests an objective that requires the capture and punishment of the individuals named in the poster." *Id.* ¶ 41. Moreover, Plaintiffs state that the Deadly Dozen List is reasonably perceived

by Plaintiffs to be a threat of force against Plaintiffs, as demonstrated by the following: (1) Defendants made threatening statements in connection with release of the Deadly Dozen List; (2) in response to release of the Deadly Dozen List, the Federal Bureau of Investigation and United States Department of Justice offered the doctors on the Deadly Dozen List protection 24 hours a day; and (3) attacks on physicians occurred after release of similar type posters. *Id.* ¶ 43. Indeed, Plaintiffs' allegations show a sustained temporal pattern in which a physician is shot to death shortly after his picture appears on a "wanted" poster (Exs. C, D, and E; as alleged *Id.* ¶¶ 53, 55; 56, 58; and 60, 68). Exhibits A and B, like Exhibit E, the distribution of which preceded the shooting of Dr. Britton, his wife, and volunteer escort, contain the specific language "crimes against humanity." All five posters contain descriptions which specifically identify each physician.

After the Deadly Dozen List was distributed, Defendant McMillian publicly encouraged violence against abortionists on March 27, 1995:

> "More violence is inevitable, and it is righteous. * * * It wouldn't bother me if every abortionist in the country today fell dead from a bullet."

*Id.* ¶ 45 (quoting Defendant McMillian). In addition, Defendant Bray sells bumper stickers that read, " 'Execute Murderers–Abortionists.' " *Id.* (quoting Defendant Bray's Bumper Stickers). Both Defendants Crane and Ramey also sported these bumper stickers.

Furthermore, an illustration in the July 1995 issue of the *Life Advocate* [2] depicted a

---

tiffs operate clinics and provide health services including abortions. The individual Plaintiffs are all doctors who perform abortions.

"Defendants" include two Portland-based associations and several individual Defendants: the American Coalition of Life Activists ("ACLA"), Advocates for Life Ministries ("ALM"), Michael Bray, Andrew Burnett, David Crane, Timothy Dreste, Michael Dodds, Joeseph Foreman, Charles McMillan, Stephen Mears, Monica Miller, Bruce Murch, Catherine Ramey, David Stover, Donald Treshman, Charles Wysong. The two associational Defendants oppose abortions

and all the individual Defendants have allegedly been involved with ACLA and other anti-abortion organizations. ALM coordinates the Northwest Region of ACLA.

When collectively referring to the individual Plaintiffs or Defendants, they shall be termed "Individual Plaintiffs" or "Individual Defendants."

2. This magazine is published and distributed by ALM. Compl. ¶ 18. Specifically, Defendant Burnett publishes the magazine, Defendant Ramey is associate editor of the magazine, and

pot of thick liquid on which is drawn a map of four cities where abortionists have been killed. The illustration also depicted several cans, each bearing the name of an abortionist, from which the contents were being poured into the pot. Next to the illustration is a biblical quote referring to the shedding of blood. *Id.* ¶ 46. Plaintiff alleges that "[t]his picture obviously is intended to be an endorsement of the prior murders and shootings of abortion providers and to cause further violence against members of the plaintiff classes."[3] *Id.*

Finally, in August 1995, during a convention in St. Louis, Missouri, "defendants, acting in furtherance of their conspiracy, unleashed a new wave of threatening posters into interstate commerce * * * that target for violence physicians who provide abortions * * *." *Id.* ¶ 47–48. One of the posters targets Plaintiff Crist by including his name, home and work addresses, and his photograph. *Id.* ¶ 48, Ex. B. In addition, during the convention, Defendants released several posters which targeted abortion clinics. *Id.* ¶ 49.

To provide context to Defendants' activities, Plaintiffs also allege several violent incidents involving abortionists and clinics:

(1) in March 1993, Dr. David Gunn was murdered after his name, physical description, address, and description of his car, appeared on an "unwanted" poster, *Id.* ¶¶ 53–55, Ex. C;

(2) in August 1993, Dr. George Patterson was murdered after release of a "wanted" poster containing a description of himself and his car, *Id.* ¶¶ 56–58, Ex. D;

(3) in May 1993, after Defendant Treshman stated that "we have been assured that [Dr. Crist] will be monitored and appropriate action will be taken," a shot gun was fired several times into the children's play-room at Plaintiff Crist's home, *Id.* ¶¶ 59–60;

Defendant Stover contributes to the magazine. Compl. ¶¶ 20, 29, 30.

3. On July 9, 1996, Plaintiffs withdrew their class allegations from the Complaint; therefore, allegations which refer to the class shall be stricken

(4) in August 1993, a member of ALM shot Dr. George Tiller after the *Life Advocate* published several articles about him, and Defendants Bray and Stover praised the shooting, *Id.* ¶¶ 61–62;

(5) in July 1994, Dr. James Barrett was murdered after publication of an "unwanted" poster featuring his name, photograph, home address, work and home telephone numbers, and date of birth, *Id.* ¶¶ 66–68, Ex. E;

(6) in November 1994, after Defendant McMillan stated publicly, "Why would a person [assassinate] publicly, when maybe he could have done it clandestinely, with a high-powered rifle * * *," Dr. Garson Romalis was shot in the leg by a sniper with an assault rifle, *Id.* ¶¶ 73–74;

(7) in December 1994, after the *Life Advocate* noted that Dr. Britton's murder caused other abortionists to resign, a gunman killed two clinic workers at the Planned Parenthood and Preterm Abortion Clinics in Brookline, Massachusetts, as well as fired shots into the Hillcrest Clinic in Norfolk, Virginia, *Id.* ¶¶ 77–78.

Plaintiffs contend that "Defendants' unrelenting threats, including and in connection with the repeated distribution of 'unwanted'-style posters, as noted above, has [sic] aggravated the past violence and has [sic] instilled fear in all plaintiffs that more violence is yet to come if defendants are not stopped." *Id.* ¶¶ 80.

### CAUSES OF ACTION

Based on the above allegations, Plaintiffs assert the following seven causes of action:

(1) Defendants have conspired to violate FACE, 18 U.S.C.A. § 248(a)(1), by intending to injure, threaten and intimidate Plaintiffs through the dissemination of "unwanted"-style posters which target abortion providers like Plaintiffs who are aggrieved persons within the meaning of 18 U.S.C.A. § 248(c)(1)(a);[4]

unless they are relevant and apply to the named Plaintiffs in this action.

4. Section 248(a)(1) reads:
 **(a) Prohibited activities.—Whoever—**
 (1) by force or threat of force or by physical obstruction, intentionally injures, intimidates

(2) Defendants violated FACE, § 248(a)(1), by threatening, injuring, and intimidating Plaintiffs because they are providing "reproductive health services";

(3) Defendants, except ACLA, violated RICO, 18 U.S.C. § 1962(c), by participating and agreeing to participate in the operation or management of ACLA's affairs through a pattern of racketeering activity that involves at least two predicate acts which include publication of the Deadly Dozen List and similar oral or written publications

(4) Defendants, except ACLA, violated 18 U.S.C. § 1962(d) by conspiring to violate RICO as a result of agreeing to the commission of two or more of the predicate acts;[6]

(5) Defendants violated ORICO, ORS 166.720(3), for the same reasons evinced under Plaintiffs' federal RICO claims;[7]

(6) Defendants violated ORS 166.720(4) by conspiring to violate ORICO;[8]

---

or interferes with or attempts to injure, intimidate or interfere with any person because that person is or has been, or in order to intimidate such person or any other person or any class of persons from, obtaining or providing reproductive health services * * *.

Section 248(c)(1)(A) provides a right of action:

Any person aggrieved by reason of the conduct prohibited by subsection (a) may commence a civil action for the relief set forth in subparagraph (B), except that such an action may be brought under subsection (a)(1) only by a person involved in providing or seeking to provide, or obtaining or seeking to obtain, services in a facility that provides reproductive health services * * *.

In an action under § 248(c)(1)(A), "the court may award appropriate relief, including temporary, preliminary or permanent injunctive relief and compensatory and punitive damages, as well as the costs of suit and reasonable fees for attorneys and expert witnesses." 18 U.S.C.A. § 248(c)(1)(B).

Section 248(e)(5) defines "reproductive health services" as "reproductive health services provided in a hospital, clinic, physician's office, or other facility, and includes medical, surgical, counseling or referral services relating to the human reproductive system, including services relating to pregnancy or the *termination of a pregnancy*." (Emphasis added).

5. Section 1962(c) of RICO provides:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

Furthermore, Defendants' predicate acts include violations of 18 U.S.C. § 1951 (the "Hobbs Act") and ORS 163.275 (Oregon Coercion Statute). Section 1951(a) of the Hobbs Act reads in relevant part:

(a) Whoever in any way or degree obstructs, delays, or affects commerce * * * by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.

Section 163.275(1) of the Oregon coercion statute defines the crime of coercion and reads in relevant part:

(1) a person commits the crime of coercion when the person compels or induces another person to engage in conduct from which the other person has a legal right to abstain, or to abstain from engaging in conduct in which the other person has a legal right to engage, by means of instilling in the other person a fear that, if the other person refrains from the conduct compelled or induced or engages in conduct contrary to the compulsion or inducement, the actor or another will:

(a) Unlawfully cause physical injury to some person; or

(b) Unlawfully cause damage to property; or

(c) Engage in conduct constituting a crime; or * * *

(e) Cause or continue a strike, boycott or other collective action injurious to some person's business, except that such a threat shall not be deemed coercive when the act or omission compelled is for the benefit of the group in whose interest the actor purports to act * * *.

6. Section 1962(d) prohibits conspiracies to violate RICO: "It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

7. Section 166.720(3) makes it "unlawful for any person employed by, or associated with, any enterprise to conduct or participate, directly or indirectly, in such enterprise through a pattern of racketeering activity or the collection of an unlawful debt."

8. Section 166.720(4) prohibits "any person to conspire or endeavor to violate any of the provisions of subsections (1), (2) or (3) of this section."

(7) Finally, Defendants' intentional conduct transgresses the bounds of socially tolerable conduct and caused Plaintiffs to suffer emotional distress which is actionable under Oregon tort law.

Plaintiffs request a declaration that Defendants' conduct violates FACE, RICO, ORICO, and state law, and is not protected by the First Amendment of the United States Constitution. Furthermore, Plaintiffs seek an injunction preventing Defendants from continuing to violate FACE, ORICO, and any other laws by publishing the Deadly Dozen List and similar posters. In sum, Plaintiffs demand compensatory damages of at least $200 million, punitive damages of at least $300 million, and treble damages of at least $300 million.

In response to Plaintiffs' allegations, Defendants moved to dismiss the Complaint under Fed.R.Civ.P. 12(b)(2) for lack of personal jurisdiction, under Rule 12(b)(6) for failure to state a claim, and under Rule 12(c) for judgment on the pleadings. I examine these motions below.

## STANDARD

On a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, plaintiff bears the burden of establishing jurisdiction. *Farmers Ins. Ex. v. Portage La Prairie Mut. Ins. Co.*, 907 F.2d 911, 912 (9th Cir.1990). However, "[w]here [as here] a district court acts on a defendant's motion to dismiss under Rule 12(b)(2) without holding an evidentiary hearing, the plaintiff need make only a prima facie showing of jurisdictional facts to withstand the motion to dismiss." *Ballard v. Savage*, 65 F.3d 1495, 1498 (9th Cir.1995). That is, plaintiff need only demonstrate facts that if true would support jurisdiction over the defendant. *Id.*

A Rule 12(b)(6) motion to dismiss for failure to state a claim can be granted only if it appears beyond doubt that the plaintiff can prove no set of facts in support of its claim which would entitle it to relief. *Parks School of Business, Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir.1995); *Mountain High Knit-ting, Inc. v. Reno*, 51 F.3d 216, 218 (9th Cir.1995). All allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party. *National Wildlife Federation v. Espy*, 45 F.3d 1337, 1340 (9th Cir.1995); *Everest and Jennings v. American Motorists Ins. Co.*, 23 F.3d 226, 228 (9th Cir.1994). Similarly, a Rule 12(c) motion for "judgment on the pleadings is appropriate when, even if all allegations in the complaint are true, the moving party is entitled to judgment as a matter of law." *Westlands Water Dist. v. Firebaugh Canal*, 10 F.3d 667, 670 (9th Cir.1993) (citing *Hal Roach Studios v. Richard Feiner & Co.*, 896 F.2d 1542, 1550 (9th Cir.1990)).

## DISCUSSION

Although many of the Defendants filed separate Motions to Dismiss and briefs in support of those motions, most of the arguments address identical issues or adopted analyses in other Defendants' memoranda. Therefore, unless otherwise designated, I consolidate and address the Defendants' contentions together.

Defendants maintain that this Court lacks personal jurisdiction over Defendants and they also attack each of Plaintiffs' seven causes of action. I address each ground for dismissal in turn.

### I. Personal Jurisdiction

#### A. Individual Defendants' Arguments [9]

Defendants contend that this Court may not assert general jurisdiction over them for several reasons: (1) they were not physically served with the Complaint in Oregon; (2) they are not domiciled in Oregon; (3) they do not engage in substantial activities in Oregon; and (4) they did not expressly consent to this Court's exercise of jurisdiction over them. In addition, this Court cannot assert long-arm jurisdiction over Defendants because Plaintiffs' allegations do not sufficiently show that Defendants distributed threatening posters which were used or consumed in Oregon through the ordinary course of trade.

---

9. Specifically, Defendants Mears, Dodds, Miller, Treshman, Dreste, Foreman, and Wysong join in this argument. These Defendants reside in the following states, respectively: New Hampshire, Kansas, Wisconsin, Maryland, Missouri, California, and Tennessee.

Finally, Defendants argue that long-arm jurisdiction would also violate their due process rights because: (1) Defendants have not purposefully availed themselves of the privileges in Oregon; (2) Defendants' activities have not arisen out of forum-related activities; and (3) extension of jurisdiction would be unreasonable.

### B. Plaintiffs' Arguments

In opposition, Plaintiffs assert that the Court may properly exercise jurisdiction because, through their activities with ACLA, Defendants are responsible for publication and distribution of the Dirty Dozen List which intentionally targets two Oregon physicians, Drs. James and Elizabeth Newhall, who are Plaintiffs in this action. Because Defendants directed their anti-abortion efforts directly against Oregon residents, they had purposeful contact with Oregon which resulted in the injury that is the subject of this lawsuit.

### C. Analysis

▪ Although seven Defendants join in Defendants Mears' and Dodds' argument in support of dismissal for lack of personal jur-

isdiction, only Defendants Mears, Dodds, Treshman, and Miller raised the defense of lack of personal jurisdiction in their first responsive pleading. Defendants Foreman, Wysong, and Dreste failed to dispute personal jurisdiction in their Answer. "A general appearance or responsive pleading by a defendant that fails to dispute personal jurisdiction will waive any defect in service or personal jurisdiction." *Benny v. Pipes*, 799 F.2d 489, 492 (9th Cir.1986) (citing Fed. R.Civ.P. 12(h)(1)), *cert. denied*, 484 U.S. 870, 108 S.Ct. 198, 98 L.Ed.2d 149 (1987). Therefore, Defendants Foreman, Wysong and Dreste waived their right to dispute personal jurisdiction, and I address this argument only with respect to Defendants Mears, Dodds, Miller, and Treshman.

▪ Personal jurisdiction over a nonresident defendant is tested by a two-part analysis: the exercise of jurisdiction must (1) satisfy the requirements of the applicable federal statute governing personal jurisdiction,[10] or if none exists, the long-arm statute of the state in which the district court sits; and (2) comport with principles of federal due process. *Terracom v. Valley Nat. Bank*, 49 F.3d 555, 559 (9th Cir.1995). Oregon's

---

**10.** RICO contains an applicable provision governing service of process, 18 U.S.C. § 1965(b) which provides:

> In any action under section 1964 of this chapter in any district court of the United States in which it is shown that the ends of justice require that other parties residing in any other district be brought before the court, the court may cause such parties to be summoned, and process for that purpose may be served in any judicial district of the United States by the marshal thereof.

In federal question cases, a court has personal jurisdiction over non-resident defendants only if they are amenable to service of process and the exercise of jurisdiction comports with due process. *Omni Capital International v. Rudolf Wolff & Co.*, 484 U.S. 97, 111, 108 S.Ct. 404, 413, 98 L.Ed.2d 415 (1987). Section 1965(b) of RICO allows nationwide service provided that "the court * * * ha[s] personal jurisdiction over at least one of the participants in the alleged multidistrict conspiracy and the plaintiff * * * show[s] that there is no other district in which a court will have personal jurisdiction over all of the alleged co-conspirators." *Butcher's Union Local No. 498 v. SDC Inv., Inc.*, 788 F.2d 535, 539 (9th Cir.1986). Therefore, section 1965(b) permits a district court to exercise jurisdiction over all RICO co-conspirators if the court has personal

jurisdiction over only one of the defendants. *See Hawkins v. Upjohn Co.*, 890 F.Supp. 601, 606 (E.D.Tex.1994) (examining whether only one of several RICO co-conspirator defendants was subject to the Texas long-arm statute within the due process limits).

Although § 1965(b) does not completely obviate the need for applying the traditional due process "minimum contacts" analysis with respect to the forum State, plaintiffs need only show that this court could exercise personal jurisdiction, without offending due process, over one of the RICO co-conspirators. Conversely, under the traditional "minimum contacts" analysis, to comport with due process, a defendant must have certain "minimum contacts" with the forum State and "[e]ach defendant's contacts with the forum State must be assessed individually." *Calder v. Jones*, 465 U.S. 783, 788–90, 104 S.Ct. 1482, 1486–87, 79 L.Ed.2d 804 (1984).

In the present action, several alleged co-conspirator Defendants reside in Oregon; therefore, under section 1965(b), this Court has nationwide jurisdiction over all other co-conspirator Defendants. Consequently, the traditional "minimum contacts" analysis is not required for Plaintiffs' RICO claims. Nevertheless, I examine personal jurisdiction of the non-resident Defendants with regard to the other federal and state law claims.

long-arm statute, ORCP 4, confers jurisdiction to the extent permitted by the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Gray & Co. v. Firstenberg Machinery Co.*, 913 F.2d 758, 760 (9th Cir.1990) (citing ORCP 4L;[11] *Oregon ex rel. Hydraulic Servocontrols Corp. v. Dale*, 294 Or. 381, 384, 657 P.2d 211 (1982)). Therefore, because Oregon's long-arm statute is coextensive with the outer limits of federal due process, I need only analyze the second prong of the personal jurisdiction test. *Chan v. Society Expeditions, Inc.*, 39 F.3d 1398, 1405 (9th Cir.1994).

■ "The Due Process Clause of the Fourteenth Amendment to the United States Constitution permits personal jurisdiction over a defendant in any State with which the defendant has 'certain minimum contacts * * * such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.' [citation omitted]." *Calder v. Jones*, 465 U.S. 783, 788, 104 S.Ct. 1482, 1486, 79 L.Ed.2d 804 (1984) (quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945)). For a defendant to be subject to general personal jurisdiction, he must have such "continuous and systematic contacts with the forum that the exercise of jurisdiction does not offend traditional notions of fair play and substantial justice." *Reebok Intern. Ltd. v. McLaughlin*, 49 F.3d 1387, 1391 (9th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 276, 133 L.Ed.2d 197 (1995). However, where, as here, the defendant's contacts with the forum are not continuous and systematic, the forum may exercise only specific personal jurisdiction, which is determined by the following three-part test:

"(1) The nonresident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, there-

by invoking the benefits and protections of its laws;

(2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and

(3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable."

*Id.* (quoting *Core–Vent Corp. v. Nobel Industries AB*, 11 F.3d 1482, 1485 (9th Cir.1993)).

### 1. Purposeful Availment

■ "This purposeful availment requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts, or of the unilateral activity of another party or third person." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475, 105 S.Ct. 2174, 2183, 85 L.Ed.2d 528 (1985) (citations and internal quotation marks omitted) (merely contracting with a resident of a forum state is insufficient to confer specific jurisdiction over a nonresident). Different standards for purposeful availment apply to tort cases, as compared to contract cases. *Ziegler v. Indian River County*, 64 F.3d 470, 473 (9th Cir. 1995) (extended specific jurisdiction to non-resident defendants who caused plaintiff to be unlawfully arrested in the forum state). Unlike a contract case (e.g. *Burger King* ), in a tort case, "jurisdiction may attach if an out-of-forum defendant merely engages in conduct aimed at, and having effect in, the situs state." *Ziegler,* 64 F.3d at 473 (citing *Roth v. Garcia Marquez,* 942 F.2d 617, 621 (9th Cir.1991)).

■ "[T]he three elements of purposeful availment in tort cases are: (1) intentional action; (2) aimed at the forum state; and (3) causing harm that the defendant should have anticipated would be suffered in the forum state." *Ziegler,* 64 F.3d at 474 (citing *Core–Vent* at 1486). The lack of physical contact with the forum does not necessarily defeat jurisdiction. *Calder,* 465 U.S. at 788, 104

---

11. Oregon's long-arm statute, ORCP 4, lists several specific instances where the court may exercise personal jurisdiction over a defendant, and then adds in ORCP 4L, "Notwithstanding a failure to satisfy the requirement of sections B through K of this rule, [a court has personal jurisdiction] in any action where prosecution of the action against a defendant in this state is not inconsistent with the Constitution of this state or the Constitution of the United States."

S.Ct. at 1486 (personal jurisdiction proper where nonresident's wrongdoing is intentionally directed at a resident); *Ziegler,* 64 F.3d at 474.

In the present action, Plaintiffs assert a claim under state tort law, as well as claims under FACE, RICO, ORICO, which all involve tortious-type conduct. Therefore, in determining whether Defendants purposefully availed themselves of this forum, I apply the analysis for tort cases, set forth in *Ziegler.*

According to Plaintiffs' factual allegations, Defendant ACLA, "acting through and in active concert with each of the other defendants, publicly announced and released into interstate commerce" the Deadly Dozen List which targeted two Oregon Plaintiffs by listing their names and addresses. Compl. ¶ 40, Ex. A. "Defendants intended for the Deadly Dozen List to instill fear in the doctors specifically named therein * * * [and] have distributed and continue to distribute the Deadly Dozen List throughout the United States, with the intent to spread their message of violence against plaintiffs and to intimidate plaintiffs and cause them serious physical and emotional harm." Compl. ¶¶ 41, 43. As Plaintiffs document in their Complaint, lists or posters similar to those distributed by Defendants have resulted in death or injury to other doctors who perform abortions.

These factual allegations show that Defendants targeted two Oregon doctors with the intention to instill fear in the doctors and cause them serious physical and emotional harm. Therefore, the purposeful availment requirements of *Ziegler* are easily met: Defendants' wrongful conduct was aimed directly at two Oregon doctors who Defendants knew were in Oregon and who Defendants clearly anticipated and hoped would suffer the intended harm. Consequently, I find that all Defendants purposefully availed themselves of Oregon law.

### 2. Arising Out Of

■ The claims arise out of a defendant's forum-related activities if plaintiff would not have a cause of action "but for" defendant's contacts with the forum. *Ziegler,* 64 F.3d at 474. The "but for" test should not be narrowly applied; rather, the requirement is merely designed to confirm that there is some nexus between the cause of action and defendant's contact with the forum. *Shute v. Carnival Cruise Lines,* 897 F.2d 377, 385 (9th Cir.1990), *rev'd on other grounds,* 499 U.S. 585, 111 S.Ct. 1522, 113 L.Ed.2d 622 (1991). As in *Ziegler,* there is no dispute in this case that "but for" the contacts between Defendants and Oregon, the Oregon Plaintiffs would not have suffered the injury which is the subject of this lawsuit against Defendants. *Ziegler* 64 F.3d at 474. Therefore, Plaintiffs' alleged injuries arise out of Defendants' contact with Oregon.

### 3. Reasonableness of Exercising Jurisdiction

■ In determining whether exercise of jurisdiction is reasonable, the court must weigh all of the following seven factors:

(1) the extent of the defendant's purposeful injection [sic] into the forum;

(2) the defendant's burdens from litigating in the forum;

(3) the extent of conflict with the sovereignty of the defendant's state;

(4) the forum state's interest in adjudicating the dispute;

(5) the most efficient judicial resolution of the controversy;

(6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and

(7) the existence of an alternative forum.

*Ziegler,* 64 F.3d at 475 (citing *Terracom v. Valley Nat. Bank,* 49 F.3d 555, 561 (9th Cir.1995)). No single factor is dispositive. *Terracom* at 561 (citing *Core–Vent,* 11 F.3d at 1488). I address each factor in turn.

### a. Purposeful Interjection

"[T]he extent of interjection is to be considered: 'Even if there is sufficient interjection into the state to satisfy the [purposeful availment prong], the degree of interjection is a factor to be weighed in assessing the overall reasonableness of jurisdiction under the [reasonableness prong]." *Core–Vent,* 11 F.3d at 1488 (quoting *Insurance Company of North America v. Marina Salina Cruz,* 649

F.2d 1266, 1271 (9th Cir.1981) (internal quotation marks omitted)). Like *Ziegler,* where Florida defendants caused a California plaintiff to be arrested in California, in this case, Defendants significantly interjected into Oregon by publishing and nationally distributing threats directed at two Oregon Plaintiffs. The harmful effects in Oregon caused by Defendants' actions were not merely incidental; rather, Defendants intentionally directed their actions towards Oregon so that the Oregon Plaintiffs would be physically and emotionally injured. *See Ziegler,* 64 F.3d at 475 ("[defendants] intentionally directed their actions towards California, for the purpose of having [plaintiff] arrested there and extradited. Their purposeful injection [sic] into California was significant."). Consequently, Defendants' significant interjection into Oregon, for the purpose of injuring the Oregon Plaintiffs, weighs in favor of exercising jurisdiction here.

### b. Burden on Defense

The second factor concerns Defendants' burden in litigating this case in Oregon. Unlike other cases involving nonresident defendants, the four Defendants in this case who challenge personal jurisdiction in Oregon are each from a different State: New Hampshire, Kansas, Wisconsin, and Maryland. As a collective group, no one State is less burdensome than another for the Defendants. However, for each individual Defendant, their resident State is obviously less burdensome than Oregon because none of the Defendants have significant physical contacts with Oregon. Accordingly, the burden on each Defendant in litigating in Oregon tips slightly in Defendants' favor.

### c. Conflict with Nonresident State's Sovereignty

Although Defendants' States may have an interest in protecting their residents' rights under the First Amendment to the United States Constitution, their States have little interest in resolving claims which involve unprotected tortious conduct of their residents, as alleged by Plaintiffs. Therefore, interfer-

ence with the sovereignty of the nonresident States is minimal and this third factor favors jurisdiction.

### d. Forum State's Interest

Like other States, Oregon maintains a strong interest in providing an effective means of redress for its residents who are tortiously injured. *See Core–Vent,* 11 F.3d at 1489 (noting that California maintains a strong interest in providing redress to its residents who are tortiously injured). Therefore, this fourth factor also supports exercising personal jurisdiction.

### e. Efficiency

Similarly, the fifth factor also weighs in favor of exercising jurisdiction in Oregon because Oregon contains more parties to this lawsuit than any other State. In evaluating this factor, the Ninth Circuit instructs that the court should look "'primarily at where the witnesses and the evidence are likely to be located.'" *Ziegler,* 64 F.3d at 475–76 (quoting *Core–Vent,* 11 F.3d at 1489). Because the parties will be witnesses in this action, Oregon contains a larger number of witnesses than any other single State. Although the four Defendants who oppose jurisdiction do not reside in Oregon, the following co-defendants are physically present in Oregon: ACLA, ALM, Burnett, Ramey, and Stover. Furthermore, five of the Plaintiffs are also located in Oregon: Planned Parenthood, Portland Feminist, Elizabeth Newhall, James Newhall, and Karen Sweigert. Therefore, Oregon is the most efficient forum for resolution of this matter.[12]

### f. Importance of Forum to Plaintiffs

█ Obviously, Plaintiffs would prefer to litigate in Oregon, but "mere preference on the part of the plaintiff for its home forum does not affect the balancing * * *." *Core–Vent,* 11 F.3d at 1490. Plaintiffs have not suggested that they cannot obtain identical relief in other States. However, the overwhelming majority of parties are physically present in Oregon; thus, it would be foolish to require Plaintiffs to seek redress in some

---

**12.** The Court is mindful that this factor has recently been discounted because "'[m]odern advances in communications and transportation have significantly reduced the burden of litigat-

ing [out-of-state].'" *Caruth v. International Psychoanalytical Ass'n,* 59 F.3d 126, 129 (9th Cir. 1995) (quoting *Sinatra v. National Enquirer,* 854 F.2d 1191, 1199 (9th Cir.1988)).

other State where personal jurisdiction as to other Defendants may be lacking. This factor neither adds nor detracts from the reasons for exercising jurisdiction in Oregon.

### g. Unavailability of Alternative Forum

■ As with the sixth factor above, Plaintiffs do not argue that no other forum exists. " 'Plaintiff bears the burden of proving the unavailability of an alternative forum.' " *Ziegler*, 64 F.3d at 476 (quoting *Core–Vent*, 11 F.3d at 1490). Clearly, Plaintiffs could sue in another State. However, Plaintiffs' failure to satisfy this factor has little effect on the determination to exercise jurisdiction in this case.

### h. Balancing Factors

In sum, factors 1 (purposeful interjection), 3 (non-forum States' sovereignty), 4 (Oregon's interest), and 5 (efficiency), favor Plaintiffs. At best, factors 2 (burden on Defendants), 6 (importance of forum to Plaintiffs), and 7 (alternative forum), tip in favor of Defendants. However, Defendants' purposeful interjection, Oregon's interest in providing redress to its residents, and efficiency, decisively tip the balance in Plaintiffs' favor towards exercising jurisdiction.

■ "Once purposeful availment has been established, the forum's exercise of jurisdiction is *presumptively reasonable*. To rebut that presumption, a defendant must present a *compelling* case that the exercise of jurisdiction would, in fact, be unreasonable." *Ziegler*, 64 F.3d at 476 (quoting *Roth v. Garcia Marquez*, 942 F.2d at 625 (internal quotation marks omitted; emphasis in original)). Because the balance of factors strongly favors Plaintiffs, Defendants cannot overcome the presumption that exercising jurisdiction would be reasonable. Consequently, this Court has specific personal jurisdiction over the non-resident Defendants who timely challenged jurisdiction: Mears, Dodds, Treshman, and Miller. Likewise, this Court has personal jurisdiction over all other Defendants because they either reside or are principally located in Oregon, or they waived their right to object to personal jurisdiction under Fed.R.Civ.P. 12(h)(1).

### II. Prohibition Of Speech Protected By The First Amendment

#### A. Defendants' Arguments

Addressing the merits of Plaintiffs' claims, Defendants contend that Plaintiffs impermissibly seek to prohibit speech protected by the First Amendment. Defendants' anti-abortion protests are speech and may not be proscribed merely because they are offensive and intimidating to Plaintiffs. Furthermore, Defendants' oral statements and posters do not fall within the "fighting words" exception to protected speech because that expression does not incite imminent lawless action which is likely to occur. In fact, Plaintiffs failed to alleged that their anti-abortion expressions either incite imminent violence or are likely to produce the violence. Therefore, based upon the undisputed allegations in the Complaint, Defendants' expressions are not "fighting words" and must be protected.

#### B. Plaintiffs' Arguments

Contrary to Defendants' characterization of Plaintiffs' theory, Plaintiffs do not contend that Defendants' expression must incite imminent violence to be forbidden. Instead, they argue that Defendants' actions constitute "true threats" which are prohibited by FACE and not protected by the First Amendment. Although Defendants' expression does not expressly threaten Plaintiffs, they assert that the expression becomes a "true threat" when placed in context. Therefore, by alleging the context surrounding Defendants' expression and its effect upon Plaintiffs, Plaintiffs have alleged sufficient facts to support the conclusion that Defendants' expression constitutes "true threats" which are not protected speech under the First Amendment.

#### C. Analysis

Plaintiffs seek to prohibit Defendants' conduct under FACE, 18 U.S.C. § 248, which regulates three types of activities: (1) the use of "force," (2) "threat[s] of force," and (3) "physical obstruction." 18 U.S.C. § 248(a). Only the second proscribed activity, "threats of force," constitutes expressive conduct eligible for protection under the First Amend-

ment. *See Wisconsin v. Mitchell,* 508 U.S. 476, 484–85, 113 S.Ct. 2194, 2198–99, 124 L.Ed.2d 436 (1993) ("[a] physical assault is not by any stretch of the imagination expressive conduct protected by the First Amendment"). Furthermore, FACE only forbids "threats of force" that "intimidate" which is defined as to "place a person in reasonable apprehension of bodily harm" *Id.* § 248(e)(3).

■ "True threats" are not protected by the First Amendment. *Watts v. United States,* 394 U.S. 705, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969) (upholding statute that criminalized threats of violence against the president but concluding that the statement, "If they ever make me carry a rifle the first man I want to get in my sights is L.B.J.," was political hyperbole and not a "true threat" given its context); *see also R.A.V. v. St. Paul, Minn.,* 505 U.S. 377, 388, 112 S.Ct. 2538, 2546, 120 L.Ed.2d 305 (1992) ("threats of violence are outside the First Amendment"); *Melugin v. Hames,* 38 F.3d 1478, 1484–86 (9th Cir.1994) (upholding constitutionality of statute, as interpreted by the Alaska Court of Appeals, which criminalized threats of death or physical injury). However, statutes which punish "a form of pure speech, must be interpreted with the commands of the First Amendment clearly in mind." *Watts,* 394 U.S. at 707, 89 S.Ct. at 1401. Therefore, "[w]hat is a threat must be distinguished from what is constitutionally protected speech." *Id.* Consequently, to the extent Plaintiffs seek to prohibit "true threats" under FACE, the First Amendment is not violated.[13] The issue then is determining whether Defendants' expressive conduct constitutes a "true threat."

■ The Ninth Circuit recently restated the objective test used to resolve the issue of whether a threat is a true threat: "whether a reasonable person would foresee that the statement would be interpreted by those to whom the maker communi-

cates the statement as a serious expression of intent to harm or assault." *United States v. Orozco–Santillan,* 903 F.2d 1262 (9th Cir.1990). Furthermore, "[a]lleged threats should be considered in light of their entire factual context, including the surrounding events and the reaction of the listeners." *Id.* (citing *United States v. Gilbert,* 884 F.2d 454, 457 (9th Cir.1989), *cert. denied,* 493 U.S. 1082, 110 S.Ct. 1140, 107 L.Ed.2d 1044 (1990) and *United States v. Mitchell,* 812 F.2d 1250, 1255 (9th Cir. 1987)); *accord United States v. Kelner,* 534 F.2d 1020 (2d Cir.) ("So long as the threat on its face and in the circumstances in which it is made is so unequivocal, unconditional, immediate and specific * * * as to convey a gravity of purpose and imminent prospect of execution, the statute may properly be applied."), *cert. denied,* 429 U.S. 1022, 97 S.Ct. 639, 50 L.Ed.2d 623 (1976).

*Lovell v. Poway Unified School District,* 90 F.3d 367, 372 (9th Cir.1996). Under this test, the plaintiff need not prove that the defendant had the ability or actually intended to physically harm the plaintiff. *Melugin,* 38 F.3d at 1485. "Moreover, the issue whether the [plaintiff] has shown a 'true threat' is a question of fact for the jury, not a question of law for the court." *Id.* (citing *United States v. Khorrami,* 895 F.2d 1186, 1192 (7th Cir. 1990)).

■ In *Lovell,* a student told a school counselor, "If you don't give me this schedule change, I'm going to shoot you!" *Lovell,* 90 F.3d at 369. The counselor informed the school about the student's statement; in response, the school suspended the student. *Id.* The student's parents filed suit on behalf of the student, claiming, in part, that the suspension violated the student's First Amendment rights by punishing her speech. *Id.* at 370. The Ninth Circuit concluded that the suspension did not violate the student's

---

**13.** Contrary to Defendants' assertions, Plaintiffs are not pursuing an incitement to violence theory, *see Brandenburg v. Ohio,* 395 U.S. 444, 447, 89 S.Ct. 1827, 1829, 23 L.Ed.2d 430 (1968) (expression which likely incites others to imminent violence is unprotected under the First Amendment), but rather allege that Defendants intended to harm specific Plaintiffs, as evidenced by De-

fendants' threats. *See United States v. Dinwiddie,* 76 F.3d 913, 922 n. 5 (8th Cir.1996) ("The *Brandenburg* test applies to laws that forbid inciting someone to use violence against a third party. It does not apply to statutes, like FACE, that prohibit someone from directly threatening another person"), *petition for cert. filed,* (U.S. Aug. 6, 1996) (No. 96–5615).

First Amendment rights because threats of violence are not protected speech and "[a] reasonable person in these circumstances would have foreseen that [the counselor] would interpret that statement as a serious expression of intent to harm." *Id.* at 372. Thus, a true threat exists if the target of the speaker reasonably believes that the speaker has the ability to act him or herself or to influence others to act at a level less than incitement—it is the perception of a reasonable person that is dispositive, not the actual intent of the speaker.

■ Unlike in *Lovell*, the alleged threats in this case are not so easily identified in the Complaint. Nevertheless, federal notice pleading standards are not strict and motions to dismiss are not granted "unless it appears beyond doubt that the plaintiff[s] can prove no set of facts in support of [their] claims which would entitle [them] to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). Plaintiffs allege that "Defendants have distributed and continue to distribute the Deadly Dozen List throughout the United States, with the intent to spread their message of violence against plaintiffs and to intimidate plaintiffs and cause them serious physical and emotional harm." Compl. ¶ 43, Ex. A. Furthermore, "[b]y creating and circulating [a poster tar-

geting Plaintiff Crist], the defendants intend to place Dr. Crist * * * in reasonable fear of bodily harm should he continue to perform abortions * * *." *Id.* ¶ 48, Ex. B. Viewing the Deadly Dozen List and the Crist poster in the factual context of previous "unwanted"-style posters which listed names of other doctors who were subsequently assaulted or murdered, I cannot conclude as a matter of law that a reasonable person in these circumstances would not foresee that the Plaintiffs would interpret the Deadly Dozen List and Crist poster as serious expressions of intent to harm. *See Lovell*, 90 F.3d at 372–73 ("Alleged threats should be considered in light of their entire factual context, including the surrounding events and the reaction of the listeners. * * * Given the level of violence in public schools today, it is no wonder that [the counselor] felt threatened. * * * [Nevertheless,] the final result turns upon whether a reasonable person in these circumstances should have foreseen that his or her words would have this effect." (internal quotation marks omitted)). Therefore, Defendants have not shown that Plaintiffs can prove no set of facts in support of their claim because Defendants' speech may be unprotected "true threats."[14]

■ However, the Court agrees with the observation by the American Civil Liberties

14. Defendants raised several new arguments in their Reply Brief, to which Plaintiffs have not been given an opportunity to respond. Defendants contend that (1) their expressions are not express threats and the context cannot convert the expressions into threats, (2) Defendants' expressions were public threats which must be likely to cause imminent lawless action to be actionable, and (3) the court, not a jury, determines whether a "true threat" exists.

First, although the Deadly Dozen List and the Crist poster made their alleged threats implicitly, instead of expressly stating, "We're going to kill you!," the threats are no less fearsome when couched in the context of the effect of previous posters, as well as statements by Defendants like Defendant McMillian who said, shortly after the murder of two doctors who were listed on posters, "In my opinion a sure way for the abortionists to be safe would be to have a cease-fire—the abortionists stop killing babies, then anti-abortionists would stop shooting abortionists." Compl. ¶ 69. Nothing in the objective test for "true threats" suggests that the threat of violence must be express. *See Lovell*, 90 F.3d at 372; *see also United States v. Gilbert*, 884 F.2d 454, 455–

57 (9th Cir.1989) (examining what a letter and enclosed poster *implied* to determine whether they constituted an unprotected threat), *cert. denied*, 493 U.S. 1082, 110 S.Ct. 1140, 107 L.Ed.2d 1044 (1990).

Second, the fact that the threats were publicly announced instead of privately stated does not affect the test for determining whether the threat is a "true threat." For instance, it would be absurd if a plaintiff would have to satisfy the stringent standard of imminent lawless action where the speaker threatens the plaintiff using a public television broadcast, but only have to show that a reasonable person would foresee that the recipient would interpret the threat as a serious expression of an intent to harm where the speaker threatens the plaintiff in a private letter.

Third, as stated earlier in this Opinion, contrary to Defendants' assertions, the jury determines whether a threat constitutes a "true threat." *See Melugin*, 38 F.3d at 1485 (citing *United States v. Khorrami*, 895 F.2d 1186, 1192 (7th Cir.1990), *cert. denied*, 498 U.S. 986, 111 S.Ct. 522, 112 L.Ed.2d 533 (1990)).

Union ("ACLU"), as *amicus curiae,* that Plaintiffs do not clearly separate the expression that constitutes a "true threat" from the context of the expression.[15] In addition, Plaintiffs do not clearly identify the individual Defendants who are responsible for the threats. "Civil liability may not be imposed merely because an individual belonged to a group, some members of which committed acts of violence. For liability to be imposed by reason of association alone, it is necessary to establish that the group itself possessed unlawful goals and that the individual held a specific intent to further those illegal aims." *N.A.A.C.P. v. Claiborne Hardware Co.,* 458 U.S. 886, 920, 102 S.Ct. 3409, 3429, 73 L.Ed.2d 1215 (1982). Therefore, Plaintiffs are given leave to amend their Complaint in order to clearly distinguish between the allegedly actionable and the contextual expressions, as well as specifically name the individual Defendants who intended to further the alleged threats of violence.[16]

## III. Constitutionality Of FACE

### A. Defendants' Arguments

Defendants argue that FACE violates the Commerce Clause because it regulates activity which is not sufficiently connected to interstate commerce. Second, the Fourteenth Amendment does not authorize Congress to regulate solely private conduct through FACE. Third, Defendants contend that FACE is facially unconstitutional under the First Amendment for several reasons: (1) the statute impermissibly bans speech based on its anti-abortion viewpoint; (2) FACE imposes a content-based restriction by regulating speech based upon whether it intimidates the listener; and (3) FACE is unconstitutionally vague and overbroad because it fails to define key terms and regulates speech that does not fall within the categories of "fight-

ing words" or "imminent threats of lawless action."

### B. Plaintiffs' Arguments

Plaintiffs respond by arguing first that Congress rationally concluded that the conduct regulated by FACE (*e.g.,* violence, threats of violence, and physical obstructions aimed at persons who provide abortions) affects interstate commerce. Furthermore, Congress crafted FACE so that it was reasonably tailored to regulate such conduct. Therefore, Congress properly regulates such conduct under the Commerce Clause.

Second, Plaintiffs reject Defendants' suggestion that FACE must regulate state action, in order to be valid under the Fourteenth Amendment. The relevant inquiry is whether Congress possessed authority under the Constitution for enacting FACE, not whether Congress seeks to regulate state action.

Third, Plaintiffs maintain that FACE passes constitutional muster under the First Amendment because it is viewpoint and content neutral. In addition, FACE is not constitutionally overbroad because it regulates only unprotected expression. Moreover, the statute is also not unconstitutionally vague because it clearly defines the prohibited activity.

### C. Analysis

In relevant part, FACE enables persons who provide or seek reproductive services to recover civil remedies against anyone who:

> [B]y force or threat of force or by physical obstruction, intentionally injures, intimidates or interferes with or attempts to injure, intimidate or interfere with any person because that person is or has been, or in order to intimidate such person or any other person or any class of persons

---

15. In ruling on this motion, the Court interpreted the Complaint as attacking only the Deadly Dozen List and the Crist poster, with all other expressions providing factual context.

16. Furthermore, Plaintiffs should be aware that there are serious questions concerning each Plaintiff's standing to assert the causes of action in the Complaint. I decline to resolve the issue at this juncture because Defendants have not raised it, but standing should be addressed by the parties as soon as possible. *See National Organization for Women, Inc. v. Scheidler,* 510 U.S. 249, 255, 114 S.Ct. 798, 802, 127 L.Ed.2d 99 (1994) ("Standing represents a jurisdictional requirement which remains open to review at all stages of the litigation").

from, obtaining or providing reproductive health services * * *.

18 U.S.C.A. § 248. Defendants' constitutional attacks of this statute are addressed individually below.

### 1. Commerce Clause

 The Constitution delegates to Congress the power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const., Art. I, § 8, cl. 3. "Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce [citation omitted], *i.e.*, those activities that substantially affect interstate commerce." *United States v. Lopez*, —— U.S. ——, —— – ——, 115 S.Ct. 1624, 1629–30, 131 L.Ed.2d 626 (1995) (struck down the Gun–Free School Zones Act of 1990 which criminalized possession of firearms in school zones because the statute failed to regulate activity that substantially affects interstate commerce) (citing *Maryland v. Wirtz*, 392 U.S. 183, 196 n. 27, 88 S.Ct. 2017, 2024 n. 27, 20 L.Ed.2d 1020 (1968)). "Where economic activity substantially affects interstate commerce, legislation regulating that activity will be sustained." *Lopez*, —— U.S. at ——, 115 S.Ct. at 1630. " 'Even activity that is purely intra-state in character may be regulated by Congress, where the activity, combined with like conduct by others similarly situated, affects commerce among the States or with foreign nations.' " *Hodel v. Virginia Surface Min. & Reclam. Ass'n*, 452 U.S. 264, 277, 101 S.Ct. 2352, 2360, 69 L.Ed.2d 1 (1981) (holding that the Surface Mining Control and Reclamation Act of 1977, which mandates compliance with environmental standards, did not contravene the Commerce Clause) (quoting *Fry v. United States*, 421 U.S. 542, 546, 95 S.Ct. 1792, 1795, 44 L.Ed.2d 363 (1975)).

 In determining whether a particular exercise of congressional power is valid under the Commerce Clause, "[t]he court must defer to a congressional finding that a regulated activity affects interstate commerce, if there is any rational basis for such a finding." *Hodel*, 452 U.S. at 276, 101 S.Ct. at 2360. "This established, the only remaining question for the judicial inquiry is whether 'the means chosen by [Congress] must be reasonably adapted to the end permitted by the Constitution.' " *Hodel*, 452 U.S. at 276, 101 S.Ct. at 2360 (quoting *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 262, 85 S.Ct. 348, 360, 13 L.Ed.2d 258 (1964)) (concluding that Congress had authority under the Commerce Clause to enact the Civil Rights Act of 1964 because restaurants that discriminated served fewer customers, and therefore suppressed interstate commerce).

 In the present action, Congress made the following findings when it enacted FACE:

(1) An interstate campaign of violent, threatening, obstructive and destructive conduct aimed at providers of reproductive health services across the nation has injured providers of such services and their patients, and the extent and interstate nature of this conduct place it beyond the ability of any single state or local jurisdiction to control;

(2) Such conduct, which has included blockades and invasions of medical facilities, arson and other destruction of property, assaults, death threats, attempted murder and murder, infringes upon the exercise of rights secured by federal and state law, both statutory and constitutional;

(3) Such conduct also burdens interstate commerce by forcing patients to travel from states where their access to reproductive health services is obstructed to other states, and by interfering with the interstate commercial activities of health care providers, including the purchase and lease of facilities and equipment, sale of goods and services, employment of personnel and generation of income, and purchase of medicine, medical supplies, surgical instruments and other supplies from other states * * *.

H.R.Conf.Rep. No. 488, 103d Cong., 2d Sess. 7 (1994), *reprinted in* 1994 U.S.C.C.A.N. 699, 724; *see also* H.R.Rep. No. 306, at 6–10 (1993) *reprinted in* 1994 U.S.C.C.A.N. 699, 703–707 (explaining the need for federal remedies to protect patients and providers of

reproductive health services); *see also* S.Rep. No. 117, at 31–32 (1993).

Based upon its extensive findings, Congress rationally concluded that violence, threats of force, and physical obstructions directed at persons seeking or providing reproductive health services substantially affect interstate commerce. Furthermore, all circuits which have addressed the issue agree that Congress rationally concluded that the activity regulated by FACE substantially affects interstate commerce. *See United States v. Soderna*, 82 F.3d 1370, 1373–74 (7th Cir.1996), petition for cert. filed, 65 U.S.L.W. 3086 (U.S. July 26, 1996) (No. 96–141); *United States v. Dinwiddie*, 76 F.3d 913, 920–21 (8th Cir.1996), *petition for cert. filed*, (U.S. Aug. 6, 1996) (No. 96–5615); *United States v. Wilson*, 73 F.3d 675, 680–83 (7th Cir.1995), *petition for cert. filed*, 64 U.S.L.W. 3669 (Mar. 20, 1996) (No. 95–1523); *Cheffer v. Reno*, 55 F.3d 1517, 1519–21 (11th Cir.1995); *American Life League, Inc. v. Reno*, 47 F.3d 642, 647 (4th Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 55, 133 L.Ed.2d 19 (1995). I agree with the Fourth Circuit in *Reno*, which concluded that "Congress also chose regulatory means reasonably adapted to permissible ends [because] [t]he Act's criminal and civil penalties are designed to deter violent, obstructive and destructive conduct." 47 F.3d at 647 (listing the Act's permissible ends). Therefore, in accord with all circuit courts that have examined whether Congress permissibly invoked its commerce power to enact FACE, I conclude that FACE is a constitutional exercise of Congress' power under the Commerce Clause.[17]

### 2. First Amendment

The First Amendment of the United States Constitution provides, in part, that "Congress shall make no law * * * abridging the freedom of speech * * *." "The First Amendment generally prevents government from proscribing speech, *see, e.g., Cantwell v. Connecticut*, 310 U.S. 296, 309–311 [60 S.Ct. 900, 905–06, 84 L.Ed. 1213] (1940), or even expressive conduct, *see, e.g., Texas v. Johnson*, 491 U.S. 397, 406 [109 S.Ct. 2533, 2540–41, 105 L.Ed.2d 342] (1989), because of disapproval of the ideas expressed. Content-based regulations are presumptively invalid." *R.A.V. v. St. Paul, Minn.*, 505 U.S. 377, 382, 112 S.Ct. 2538, 2542, 120 L.Ed.2d 305 (1992). Furthermore, "[w]hen the government targets not subject matter but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant. *See R.A.V. v. St. Paul*, 505 U.S. 377, 391 [112 S.Ct. 2538, 2547–48, 120 L.Ed.2d 305] (1992). Viewpoint discrimination is thus an egregious form of content discrimination." *Rosenberger, et al., v. Rector and Visitors of the University of Virginia, et al.*, —— U.S. ——, ——, 115 S.Ct. 2510, 2516, 132 L.Ed.2d 700 (1995). "The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Id.* (citing *Perry Ed. Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 46, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983)).

Regulations which "suppress, disadvantage, or impose differential burdens upon speech because of its content" are valid under the First Amendment only if they survive strict scrutiny, *Turner Broadcasting System, Inc. v. F.C.C.*, 512 U.S. 622, ——, 114 S.Ct. 2445, 2459, 129 L.Ed.2d 497 (1994), which requires Congress to "show that its regulation is necessary to serve a compelling state interest and is narrowly drawn to achieve that end." *Simon & Schuster v. New York Crime Victims Bd.*, 502 U.S. 105, 118, 112 S.Ct. 501, 509, 116 L.Ed.2d 476 (1991). However, where the regulation is content-neutral, it need only satisfy "an in-

---

**17.** In so holding, I reject Defendants' argument that a different result is compelled by *Lopez*, —— U.S. ——, 115 S.Ct. 1624 (1995), for two reasons: (1) unlike the extensive congressional findings which accompanied FACE, in *Lopez*, Congress made no findings which explained how the statute regulated activity affecting interstate commerce; and (2) unlike FACE's regulation of commercial activity with regard to the provision of health services, the statute in *Lopez* did not regulate any commercial activity. *See Dinwiddie*, 76 F.3d at 921; *Wilson*, 73 F.3d at 683–84; *Cheffer*, 55 F.3d at 1520.

Because I hold that FACE is within Congress' commerce authority, I need not consider Defendants' argument that Congress does not have authority under the Fourteenth Amendment to enact FACE.

termediate level of scrutiny," *Turner,* 512 U.S. at ——, 114 S.Ct. at 2459, which upholds the regulation if "it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *United States v. O'Brien,* 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968); *see also Perry Ed. Assn. v. Perry Local Educators' Assn.,* 460 U.S. 37, 45, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983) (applying intermediate level of scrutiny to time, place, and manner restrictions on speech). Therefore, I must first determine whether FACE is content and viewpoint neutral, and then apply the proper level of scrutiny under the First Amendment.

### a. Content– and Viewpoint–Based

 Several circuits have addressed the issue of whether FACE is content- and viewpoint-based, and I concur in their well-reasoned conclusions. *See Dinwiddie,* 76 F.3d 913, 923 (8th Cir.1996); *American Life League,* 47 F.3d 642, 651 (4th Cir.1995); *Cheffer,* 55 F.3d 1517, 1521 (11th Cir.1995) (expressly adopting rationale set forth in *American Life League* ). However, I offer a brief analysis in addition to the Eighth, Fourth, and Eleventh Circuits' discussions.

As discussed earlier in Part II.C. of this Opinion, FACE regulates the use of force, threats of force, and physical obstruction, which are activities that are not protected under the First Amendment. The fact that application of FACE is based upon whether the victim of a threat of violence is placed in "reasonable apprehension of bodily harm," does not cause the statute to become content-

based, like the ordinance in *Forsyth County, Ga. v. Nationalist Movement,* 505 U.S. 123, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992),[18] because threats of violence are not protected under the First Amendment. *See Dinwiddie,* 76 F.3d at 922.

Furthermore, FACE is not viewpoint-based merely because its application is limited to force, threats of force, or physical obstruction against a person because that person obtains or provides reproductive health services. Congress may "single[ ] out" specific types of conduct "because this conduct is thought to inflict greater individual or societal harm," *Mitchell,* 508 U.S. at 487–88, 113 S.Ct. at 2201 (upholding statute that enhances sentences for crimes motivated by racial bias), so long as no distinction is made based upon the expressive content or viewpoint of the conduct, *see R.A.V.,* 505 U.S. 377, 391–94, 112 S.Ct. 2538, 2547–49 (striking down ordinance that regulated certain types of "fighting words" which insulted or provoked violence "on the basis of race, color, creed, religion or gender" because the ordinance distinguished application based on the content and viewpoint of the "fighting words").

Unlike the ordinance in *R.A.V.,* FACE is not viewpoint-based because it prohibits all conduct regardless of the violator's viewpoint so long as that conduct is directed towards a person merely because that person obtains or provides reproductive health services. *See R.A.V.,* 505 U.S. at 390, 112 S.Ct. at 2546–47 ("Where the government does not target conduct on the basis of its expressive content, acts are not shielded from regulation merely because they express a discriminatory idea or philosophy."); *see also Dinwiddie,* 76 F.3d at 923; *American Life League,* 47 F.3d at 650–51.[19] The mere fact that a class of per-

18. In *Forsyth,* the Supreme Court struck down an ordinance which calculated permit fees for parades based on the cost of security for parade participants which varied depending on the listeners' reaction to the speech. 505 U.S. at 134–36, 112 S.Ct. at 2403–05. The Court noted that the administrator, in assessing the cost of the permit, would necessarily have to examine the contents of the message conveyed, estimate the response of others to that content, and judge the number of police necessary to meet that response. *Id.* at 134, 112 S.Ct. at 2403. However,

*Forsyth,* unlike the present action, involved speech protected under the First Amendment.

19. Moreover, FACE's proscription of conduct directed at persons *because* they obtain or provide reproductive medical services is not content- or viewpoint-based because statutes may proscribe conduct based upon the motive of the violator without impermissibly regulating the content of the expression. *See, e.g., Hishon v. King & Spalding,* 467 U.S. 69, 78, 104 S.Ct. 2229, 2235, 81 L.Ed.2d 59 (1984) (upholding Title VII which

sons with a particular viewpoint are more likely to violate the statute does not render the law a viewpoint-based regulation of speech. *See Madsen v. Women's Health Center, Inc.,* 512 U.S. 753, ——, 114 S.Ct. 2516, 2524, 129 L.Ed.2d 593 (1994) ("That petitioners all share the same viewpoint regarding abortion does not in itself demonstrate that some invidious content- or viewpoint-based purpose motivated the issuance of the order" which established a 36–foot buffer zone from which demonstrators were prohibited); *see, e.g., O'Brien,* 391 U.S. 367, 88 S.Ct. 1673 (upholding a statutory prohibition on burning draft cards despite the fact that most violators would likely oppose the Vietnam War).

Consequently, like the Eighth, Fourth, and Eleventh Circuits, I conclude that FACE is a content-neutral and viewpoint-neutral regulation. Therefore, I apply an intermediate level of scrutiny to determine whether the statute's incidental burdens on protected speech violate the First Amendment.[20]

#### b. Intermediate Scrutiny Under *O'Brien*

■ A statute survives intermediate scrutiny if (1) it is content-neutral, (2) it furthers an important or substantial governmental interest, and (3) the restriction is narrowly tailored to further that interest. *O'Brien,* 391 U.S. at 377, 88 S.Ct. at 1679. "To satisfy this standard, a regulation need not be the least speech-restrictive means of advancing the Government's interests." *Turner,* 512 U.S. 622, ——, 114 S.Ct. 2445, 2469. "Rather, the requirement of narrow tailoring is satisfied so long as the * * * regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." *Id.* (quoting *Ward v. Rock Against Racism,* 491 U.S. 781, 799, 109 S.Ct. 2746, 2758, 105 L.Ed.2d

661 (1989)) (internal quotation marks omitted).

■ FACE furthers the government's "strong interest in protecting a woman's freedom to seek lawful medical or counseling services in connection with her pregnancy," *Madsen,* 512 U.S. at ——, 114 S.Ct. at 2526 (citing *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973)), as well as the government's interest in "protecting patients and staff from violence and harm and protecting reproductive health facilities from physical destruction or damage." *American Life League,* 47 F.3d at 651. These interests are substantial and support any incidental burdens on protected speech caused by FACE, so long as the burdens are no greater than necessary to further the government's interests. FACE regulates only force, threats of force, and physical obstruction; thus, it " 'leaves open ample alternative means for communication,' " and is narrowly tailored to further the government's interests. *Dinwiddie,* 76 F.3d at 923 (quoting *American Life League,* 47 F.3d at 652) ("In a non-violent, non-obstructive manner, protestors may still stand and express their anti-abortion message. They may still proclaim their views and make their pleas by voice, signs, handbills, symbolic gestures and other expressive means").

In sum, I conclude, as did the Eighth, Fourth, and Eleventh Circuits, that FACE serves substantial government interests in preventing violence and preserving access to reproductive health services, and is narrowly tailored to further those interests, without targeting the content of the expression. *See Dinwiddie,* 76 F.3d at 924; *American Life League,* 47 F.3d at 652; *Cheffer,* 55 F.3d at 1521–22.

makes it unlawful for an employer to discriminate against an employee *"because of* such an individual's race, color, religion, sex, or national origin.") (quoting 42 U.S.C. § 2000e–2(a)(1) (emphasis added)).

**20.** Arguably, if FACE only regulates unprotected speech in a content- and viewpoint-neutral manner, I need not even apply the intermediate level of scrutiny to FACE. *Melugin,* 38 F.3d at 1483–

84 (statutes which regulate unprotected expression need only be "rationally related to a legitimate state interest"). However, because FACE's regulation of unprotected conduct " 'incidentally affect[s] some conduct with protected expressive elements, such as peaceful but obstructive picketing,' " *Dinwiddie,* 76 F.3d at 923 (quoting *American Life League,* 47 F.3d at 648), I must consider whether these burdens on protected speech violate the First Amendment under intermediate scrutiny.

### c. Vagueness and Overbreadth

 In addition, I reject Defendants' argument that FACE is unconstitutionally vague because terms like "obstruction," "interference," and "threat of force" are unclear, and "intimidate" is based upon the subjective reaction of third parties. "A statute is void for vagueness when it does not sufficiently identify the conduct that is prohibited." *United States v. Wunsch*, 84 F.3d 1110, 1119 (9th Cir.1996). Therefore, the statute must "be sufficiently clear so as not to cause persons 'of common intelligence * * * necessarily [to] guess at its meaning and [to] differ as to its application[.]'" *Id.* (quoting *Connally v. General Constr. Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926)).

In the present action, all the challenged terms, except for "threat of force," are defined by the statute. For instance, FACE defines "intimidate" as to "place a person in reasonable apprehension of bodily harm to him- or herself or to another," "interfere with" as to "restrict a person's freedom of movement," and "physical obstruction" as "rendering impassable ingress to or egress from a facility that provides reproductive health services * * *." 18 U.S.C. § 248(e)(2), (3), and (4). These specific and clear definitions, by themselves, are sufficient to defeat Defendants' vagueness challenge. Nonetheless, further support for this conclusion is found in *United States v. Gilbert*, 813 F.2d 1523 (9th Cir.1987), where the Ninth Circuit held that the terms "threat of force," "intimidate," and "interfere with," as used in the Fair Housing Act, 42 U.S.C. § 3631 (1982) (prohibits anyone who "by force or threat of force * * * intimidates or interferes with * * * any person because of his race, color, religion, sex, or national origin * * *") are not unconstitutionally vague.[21] 813 F.2d at 1530. In so holding, the court emphasized that "legislation which proscribes the use of force or the threat of force should not be found to be void for vagueness." *Id.* I see no reason for a different result in this case; FACE is not unconstitutionally vague. *See Dinwiddie*, 76 F.3d at 924; *Cheffer*, 55 F.3d at 1521–22, *American Life League*, 47 F.3d at 653.

 Likewise, I also reject Defendants' contention that FACE is unconstitutionally overbroad because it regulates speech that does not fall within two of the categories of exclusion from First Amendment protection: "fighting words" or "imminent threats of lawless action." As discussed earlier in Part II.C. of this Opinion, Plaintiffs do not claim that Defendants' actions constitute "fighting words" or an "incitement to imminent violence," but rather allege that Defendants are directing threats of violence at Plaintiffs. Therefore, the analyses under the "fighting words" and "incitement to imminent violence" doctrines do not apply here. Moreover, because true threats of violence are similarly not protected, I must reject Defendants' argument that FACE is overbroad.

Accordingly, I reject Defendants' vagueness and overbreadth arguments and hold that FACE does not violate the First Amendment. Furthermore, I also conclude that Plaintiffs have alleged sufficient facts to state a claim that Defendants' "unwanted"-style posters constitute "threats of violence" under FACE and overcome Defendants' Motion to Dismiss, pursuant to FRCP 12(b)(6).

However, although Plaintiffs succeed at this point in the litigation, there are several troubling issues with regard to their FACE claim that Plaintiffs may need to address in order to survive a motion for summary judgment: (1) whether all Plaintiffs have standing to assert a claim under FACE, (2) which specific conduct by Defendants constitutes "true threats," and (3) whether sufficient evidence warrants submitting to the jury the issue of whether Defendants' alleged conduct constitutes "true threats." At this early stage of the case, accepting all of Plaintiffs' factual allegations as true, I cannot say as matter of law that Plaintiffs have not stated a claim under FACE, but I harbor significant

---

21. Likewise, in *Cameron v. Johnson*, the Supreme Court rejected a vagueness challenge to an anti-picketing ordinance which included the terms "interfere with" and "obstruct." 390 U.S. 611, 612 n. 1, 616, 88 S.Ct. 1335, 1336 n. 1, 1338, 20 L.Ed.2d 182 (1968) (ordinance prohibited "picketing * * * in such a manner as to *obstruct* or unreasonably *interfere with* free ingress or egress to and from any * * * county * * * courthouses * * *.") (Emphasis added).

doubts as to whether Plaintiffs will possess sufficient evidence to create a material issue of fact for trial.

## IV. RICO

To state a claim under the Racketeer Influenced and Corrupt Organizations Act (RICO), a plaintiff must show that the conduct of an enterprise, through a pattern of racketeering activity, injured plaintiff's business or property. *Sedima, S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985). A "pattern" of racketeering activity does not exist unless there is evidence of at least two predicate acts. *Brady v. Dairy Fresh Products Co.,* 974 F.2d 1149, 1152 (9th Cir.1992). "Racketeering activity" is any act indictable under several provisions of Title 18 of the United States Code. *Moore v. Kayport Package Exp., Inc.,* 885 F.2d 531, 541 (9th Cir.1989) (citing 18 U.S.C. § 1961(1)) (listing the offenses).

Defendants attack Plaintiffs' RICO and ORICO claims on several grounds.[22] I address each of Defendants' contentions in turn.

### A. Pleading Standard for RICO Claims
#### 1. Arguments

First, Defendants argue that Plaintiffs failed to satisfy the heightened pleading standard mandated by Fed.R.Civ.P. 9(b)[23] for RICO claims by not pleading with particularity RICO "predicate acts" (*i.e.,* violations of federal and state criminal law) allegedly committed by Defendants.

In opposition to Defendants' Motion to Dismiss, Plaintiffs contend that they pleaded

Defendants' "predicate acts" with sufficient particularity by alleging that Defendants' threats of violence in furtherance of a plan to commit extortion and/or coercion violated the Hobbs Act, 18 U.S.C. § 1951, and Oregon's coercion statute, ORS 163.275.

#### 2. Analysis

Allegations of fraud must be stated with particularity. Fed.R.Civ.P. 9(b). Likewise, RICO claims based upon predicate acts involving fraud must be pleaded with particularity under Rule 9(b). *See Lancaster Comm. Hosp. v. Antelope Valley Hosp. Dist.,* 940 F.2d 397, 405 (9th Cir.1991) (applying Rule 9(b) to allegations of mail fraud as RICO predicate acts), *cert. denied,* 502 U.S. 1094, 112 S.Ct. 1168, 117 L.Ed.2d 414 (1992); *Alan Neuman Productions, Inc. v. Albright,* 862 F.2d 1388, 1392 (9th Cir.1988) (applying Rule 9(b) to allegations of mail and wire fraud as RICO predicate acts), *cert. denied,* 493 U.S. 858, 110 S.Ct. 168, 107 L.Ed.2d 124 (1989); *Sun Sav. and Loan Ass'n v. Dierdorff,* 825 F.2d 187, 196 (9th Cir.1987).

However, as in this case, where the alleged RICO predicate acts do not involve fraud, the more lenient pleading standard in Rule 8(a) applies.[24] *See McLaughlin v. Anderson,* 962 F.2d 187, 194 (2nd Cir.1992) (distinguishing pleading standard for RICO claims involving fraud as compared to extortion, and holding that district court erred in applying Rule 9(b) to plaintiff's extortion claim: "the district court should have evaluated the [extortion] claim against the more lenient pleading standards of [Rule] 8(a)."); *Rose v. Bartle,* 871 F.2d 331, 356 n. 33 (3rd Cir.1989) ("It should be noted that the plain-

---

22. Note that the arguments pertaining to RICO are equally applicable to ORICO because the statutes are interpreted consistently. *Pincetich v. Jeanfreau,* 699 F.Supp. 1469, 1475 (D.Or.1988); *Ius v. Butcher,* 680 F.Supp. 343, 346 n. 1 (D.Or. 1987); *Schnitzer v. Oppenheimer & Co., Inc.,* 633 F.Supp. 92, 99 (D.Or.1985); *Ahern v. Gaussoin,* 611 F.Supp. 1465, 1494 (D.Or.1985).

23. Rule 9(b) states in relevant part, "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."

24. Rule 8(a) requires:

A pleading which sets forth a claim for relief, whether an original claim, counterclaim, cross-claim, or third-party claim, shall contain (1) a short and plain statement of the grounds upon which the court's jurisdiction depends, unless the court already has jurisdiction and the claim needs no new grounds of jurisdiction to support it; (2) a short and plain statement of the claim showing that the pleader is entitled to relief, and (3) a demand for judgment for the relief the pleader seeks. Relief in the alternative or of several different types may be demanded.

tiffs allege no mail, wire or other fraud by the defendants, and therefore are not required to adhere to the higher pleading standard of 'particularity' mandated by Fed. R.Civ.P. 9(b)"); *Vicom, Inc. v. Harbridge Merchant Servs., Inc.*, 20 F.3d 771, 776 (7th Cir.1994) (unless the RICO claim involves fraud, it must conform only to the standards set out in Rule 8). Because Plaintiffs allege RICO predicate acts involving extortion under 18 U.S.C. § 1951 (the Hobbs Act) and coercion under ORS 163.275 (Oregon Coercion Statute), rather than fraud, their RICO claims need not be pleaded with particularity under Rule 9(b).[25]

▮ Under the liberal federal notice pleading standards under Rule 8, Plaintiffs need only provide "fair notice" of the claim being asserted and the "grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 45–46, 48, 78 S.Ct. 99, 101–02, 103, 2 L.Ed.2d 80 (1955). With regard to the RICO predicate acts of extortion and coercion, Plaintiffs have easily satisfied this liberal standard by alleging that Defendants violated 18 U.S.C. § 1951 and ORS 163.275 through issuing and disseminating the Deadly Dozen List, as well as other "unwanted"-style posters and publications which contain threats of force against Plaintiffs in order to induce fear in Plaintiffs and "thus to force plaintiffs to forego their right to engage in lawful activity and give up their actual and prospective business relations." Compl. ¶¶ 96–97. These allegations provide sufficient notice to Defendants of the predicate acts of extortion and coercion underlying Plaintiffs' RICO claims.

## B. Predicate Acts: Hobbs Act and Oregon Coercion Statute

### 1. Arguments

Second, Defendants contend that Plaintiffs' RICO claims fail because the predicate act allegations under the Hobbs Act and the Oregon Coercion Statute are flawed for the following reasons: (1) Plaintiffs' do not state

an extortion claim under the Hobbs Act because they fail to allege that Defendants unlawfully obtained Plaintiffs' property, and (2) the Oregon Coercion Statute, ORS 163.275, cannot be the basis for a RICO predicate act because ORS 163.275 is unconstitutionally overbroad.

In response, Plaintiffs maintain that they have presented a Hobbs Act extortion claim by alleging that Defendants prevented them from making business decisions free from threats. Furthermore, Plaintiffs properly rely on the Oregon Coercion Statute because the Oregon legislature corrected any overbreadth concerns in the statute after the Oregon Supreme Court declared it unconstitutional.

### 2. Analysis

#### a. Hobbs Act

▮ " 'The elements of a Hobbs Act violation are [1] extortion and [2] a nexus with interstate commerce.' " *United States v. Hoelker*, 765 F.2d 1422, 1424 (9th Cir.1985) (quoting *United States v. Zemek*, 634 F.2d 1159, 1173 (9th Cir.1980), *cert. denied*, 450 U.S. 916, 101 S.Ct. 1359, 67 L.Ed.2d 341, 450 U.S. 985, 101 S.Ct. 1525, 67 L.Ed.2d 821 & 452 U.S. 905, 101 S.Ct. 3031, 69 L.Ed.2d 406 (1981)), *cert. denied*, 475 U.S. 1024, 106 S.Ct. 1219, 89 L.Ed.2d 330 (1986). The Hobbs Act defines "extortion" as "the obtaining of *property* from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2) (emphasis added). "The concept of property under the Hobbs Act has not been limited to physical or tangible 'things.' The right to make business decisions and to solicit business free from wrongful coercion is a protected property right." *Zemek*, 634 F.2d at 1174 (citing *United States v. Santoni*, 585 F.2d 667, 672–73 (4th Cir.1978) (property extorted was the right of victim to make a business decision free from outside pressure wrongful-

---

**25.** Defendants cite *Schnitzer v. Oppenheimer & Co., Inc.*, 633 F.Supp. 92 (D.Or.1985), for the proposition that all RICO claims must be pleaded with particularity because " 'RICO's *in terrorem* effect is potent, in that a RICO defendant faces the unsavory label 'racketeer' as well as the risk of treble damages.' " Miller and Treshman

Mem.Supp.Mot.Dismiss at 24 (quoting *Schnitzer*, 633 F.Supp. at 97). However, that case is inapplicable to the present action because the predicate acts in *Schnitzer* were wire and mail fraud, 633 F.Supp. at 96, whereas the predicate acts here are extortion and coercion.

ly imposed), *cert. denied,* 440 U.S. 910, 99 S.Ct. 1221, 59 L.Ed.2d 459 (1979)) (other citations omitted); *see also Hoelker,* 765 F.2d at 1425 (property right involved was right to make business decisions free from threats and coercion); *see, e.g., Northeast Women's Center, Inc. v. McMonagle,* 868 F.2d 1342, 1350 (3d Cir.1989) (abortion center could recover on RICO claim based upon Hobbs Act extortion violation by protestors who used force and threats of force to close the center, regardless of whether the protestors actually succeeded, because the center had a property right to continue to operate its business), *cert. denied,* 493 U.S. 901, 110 S.Ct. 261, 107 L.Ed.2d 210 (1989).

■ In this case, Plaintiffs allege that Defendants' threats of force contained in the Deadly Dozen List, "unwanted"-style posters, and similar publications "have decreased the volume of business of plaintiffs or increased their cost of doing business, or both." Compl. ¶ 97–99. Moreover, "Defendants' activities also have injured the named plaintiffs * * * by depriving them of the right to engage in a business relationship with actual and prospective patients, to reap the economic advantages of those relationships, and to enter into such relationships free of threats of force." *Id.* ¶ 99. Defendants have allegedly caused Plaintiffs to suffer $50 million in economic damage. *Id.* ¶ 100. I find that these allegations sufficiently identify injury to Plaintiffs' property right to engage in their business without threats of violence, and are sufficient to state an extortion claim under the Hobbs Act.

### b. Oregon Coercion Statute: ORS 163.275

Plaintiffs' ORICO claims are based upon the predicate act of coercion which is defined

under ORS 163.275 (1995) and set forth in relevant part as follows:

(1) A person commits the crime of coercion when the person compels or induces another person to engage in conduct from which the other person has a legal right to abstain, or to abstain from engaging in conduct in which the other person has a legal right to engage, by means of instilling in the other person a fear that, if the other person refrains from the conduct compelled or induced or engages in conduct contrary to the compulsion or inducement, the actor or another will:

(a) Unlawfully cause physical injury to some person; * * *.

The Oregon Supreme Court struck down a former version of the Oregon Coercion Statute, ORS 163.275 (1971), as unconstitutionally overbroad under Article I, section 8, of the Oregon Constitution[26] because that version impermissibly burdened protected speech. *State v. Robertson,* 293 Or. 402, 436, 649 P.2d 569 (1982).[27] Subsequent to *Robertson,* however, the Oregon Legislature redrafted the statute in order to correct its overbreadth. According to the Oregon Court of Appeals, the current, redrafted version of at least ORS 163.275(1)(a) passes constitutional muster provided that the "fear" which is "instilled" in the other person is objectively reasonable, the physical injury that is feared is objectively reasonable, and the "some person" to whom injury is threatened is some specific person. *State v. Stone,* 84 Or.App. 575, 578, 735 P.2d 7 (1987), *rev. denied,* 303 Or. 700, 740 P.2d 1213 (1987).[28]

Plaintiffs do not specify which subsections of the Oregon Coercion Statute that they

---

**26.** Article I, section 8, of the Oregon Constitution provides: "No law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever * * *."

**27.** Specifically, the former version was overbroad because it covered "all demands to take or to refrain from nonobligatory action coupled with threats of adverse consequences in case of noncompliance, whether these demands and threats are stated privately or publicly and irrespective of the relationship of the parties themselves or with the public." *Id.* at 436.

**28.** The court in *Stone* noted that there is some disagreement as to whether the *Robertson* court declared the whole statute invalid or just subsection 163.275(1)(e), the section under which the defendant in *Robertson* was charged. *Stone,* 84 Or.App. at 575 n. 1, 735 P.2d 7. The court did not resolve the disagreement, but rather severed 163.275(1)(a) from the rest of the statute for constitutional scrutiny. Consequently, *Stone's* holding only expressly applies to ORS 163.275(1)(a). No court has interpreted any other subsection of the statute.

assert as ORICO predicate acts. Defendants challenge the constitutionality of all subsections other than § 163.275(1)(a) which was upheld in *Stone*. However, I will not engage in a blanket constitutional inquiry of the Oregon Coercion Statute if Plaintiffs only rely on subsection (1)(a). Therefore, without clear direction, this Court will assume that Plaintiffs only rely on subsection (1)(a). If this assumption is incorrect, Plaintiffs may amend their Complaint to include additional subsections, and Defendants may attack the constitutionality of the other subsections of the Oregon Coercion Statute on which Plaintiffs rely.

 Although Plaintiffs do not allege specific facts showing that Defendants *actually* committed coercion, *see State v. Johnson*, 110 Or.App. 362, 363, 822 P.2d 153 (1991) ("[c]oercion requires proof that the victim was *actually compelled or induced* to abstain from engaging in the conduct in which she had a right to engage or not to engage" (emphasis added)), Plaintiffs may nonetheless pursue claims under ORICO because "racketeering activity" under ORICO includes *attempts* to commit coercion. *See* ORS 166.715(6)(a)(I). Therefore, to prove an ORICO claim, Plaintiffs need only show that Defendants *attempted* to commit coercion, not that Defendants actually violated the Oregon Coercion Statute by coercing Plaintiffs. I find that Plaintiffs have alleged sufficient facts showing that Defendants attempted to coerce Plaintiffs from providing abortions by publishing and disseminating threats of physical harm directed at Plaintiffs.[29]

## C. Standing to Assert RICO Claims

### 1. Argument

Third, Defendants contend that even if Plaintiffs properly pleaded extortion and coercion as RICO predicate acts, Plaintiffs do not have standing under RICO because they fail to allege concrete financial loss as a result of the RICO violations. Plaintiffs did not respond to this argument.

### 2. Analysis

 RICO authorizes a private civil action by "[a]ny person injured in his business or property by reason of a violation of section 1962." 18 U.S.C. § 1964(c). Private litigants have standing under RICO only to the extent that they have been injured in their business or property by the conduct constituting the RICO violation. *Sedima, S.P.R.L. v. Imrex Company*, 473 U.S. 479, 495–96, 105 S.Ct. 3275, 3284–85, 87 L.Ed.2d 346 (1985). "[I]njuries to property are not actionable under RICO unless they result in tangible financial loss to the plaintiff." *Oscar v. University Students Co-op Ass'n*, 965 F.2d 783, 785 (9th Cir.1992) (diminution in enjoyment of leasehold interest does not constitute a tangible loss to tenant who did not allege any out-of-pocket expenditures as a direct or indirect result of the racketeering activity), *cert. denied*, 506 U.S. 1020, 113 S.Ct. 655, 656, 121 L.Ed.2d 581 (1992); *Steele v. Hospital Corporation of America*, 36 F.3d 69 (9th Cir.1994) (depletion of insurance funds by excess medical payments does not constitute a financial loss to patients). Likewise, speculative injuries do not confer standing under RICO, unless they become concrete and actual. *Steele*, 36 F.3d at 71 (claim that father of patient "could have used some of those [insurance] benefits for myself" was insufficient where father did not specify an instance where he had to pay a claim out of his own funds because the funds had been exhausted); *Oscar*, 965 F.2d at 787 (claim that plaintiff suffered losses in the reduced rent she could charge to sublet her apartment was insufficient where plaintiff did not allege that she had a right to sublet her apartment nor that she ever sublet the apartment or attempted to sublet the apartment); *Imagineering, Inc. v. Kiewit Pacific Co.*, 976 F.2d 1303, 1311 (9th Cir.1992) (claim that plaintiff suffered loss of profits was insufficient where it was impossible to determine whether plaintiffs were alleging lost opportunity to realize profits or loss of specific iden-

---

**29.** For the same reasons, Plaintiffs have also stated a claim under the Oregon Menacing Statute which provides: "(1) A person commits the crime of menacing if by word or conduct the person intentionally attempts to place another person in fear of imminent serious physical injury." ORS 163.190. A violation of the Oregon Menacing Statute may be a predicate act under ORICO. *See* ORS 166.715(6)(a)(G).

tifiable profits), *cert. denied,* 507 U.S. 1004, 113 S.Ct. 1644, 123 L.Ed.2d 266 (1993).

 In the present action, Plaintiffs allege that Defendants' racketeering activities are directed at Plaintiffs "to force plaintiffs to forego their right to engage in lawful activity and give up their actual and prospective business relations." Compl. ¶ 97. Plaintiffs further allege that "defendants' racketeering activities have decreased the volume of business of plaintiffs or increased their cost of doing business" and "are calculated to induce clinic personnel to give up their jobs and doctors to forego their economic right to practice medicine" which have injured Plaintiffs in an amount not less than $50 million for each RICO and ORICO claim. *Id.* ¶¶ 99–100.

Although Plaintiffs do not specifically identify how they calculated their damages of at least $50 million, I conclude that Plaintiffs have alleged sufficient facts regarding their concrete financial loss to confer standing, according to *National Organization for Women, Inc. v. Scheidler,* 510 U.S. 249, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994). In *Scheidler,* two corporate health care centers alleged RICO claims under § 1964(c), claiming that defendants "conspired to use threatened or actual force, violence or fear to induce clinic employees, doctors, and patients to give up their jobs, give up their economic right to practice medicine, and give up their right to obtain medical services at the clinics." *Id.* at 253, 114 S.Ct. at 801–02. Plaintiffs further alleged that the conspiracy "injured the business and/or property interests of the petitioner." *Id.* at 253–54, 114 S.Ct. at 802 (internal quotation marks omitted). The Supreme Court held that these allegations stated a claim under RICO for injury to "business or property."[30] *Id.* at 256, 114

S.Ct. at 803. I find that *Scheidler* compels the same result in this case; thus, Plaintiffs have alleged sufficient financial loss to confer standing to assert their RICO claims.[31]

**D. RICO Enterprise and Participatory Conduct**

**1. Arguments**

Fourth, Defendants argue that Plaintiffs' allegations do not show that Defendants' alleged RICO enterprise (*i.e.,* ACLA) is distinct from the pattern of racketeering activities of each Defendant, but rather demonstrate that ACLA exists solely to further Individual Defendants' racketeering activities. Moreover, Plaintiffs failed to adequately allege that Individual Defendants participated in the operation and management of the "enterprise."

Contrary to Defendants' assertions, Plaintiffs argue that they have satisfied the "enterprise" element of RICO by alleging that ACLA exists as a separate entity from the Individual Defendants and is involved in their racketeering activities. In addition, each Individual Defendant violated RICO by participating in the operation and management of the RICO "enterprise," ACLA.

**2. Analysis**

 RICO defines "enterprise" as "any individual, partnership, corporation, association, or other legal entity * * * [or] any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct," and is "separate and apart from the pattern of activity in which it engages." *United States v. Turkette,* 452 U.S. 576, 583, 101

---

**30.** In so holding, the Court quoted *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992) for the relevant proposition that " '[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim.' " *Scheidler,* 510 U.S. at 256, 114 S.Ct. at 803.

It is also noteworthy that the plaintiffs in *Scheidler,* like the Plaintiffs in the present action,

alleged extortion in violation of the Hobbs Act as one of the RICO predicate acts. *Id.* at 253, 114 S.Ct. at 801.

**31.** However, as *Scheidler* states, "[s]tanding represents a jurisdictional requirement which remains open to review at all stages of the litigation." *Id.* at 255, 114 S.Ct. at 802. Therefore, if at any time facts show that any of the Plaintiffs lack sufficient injury to confer standing to assert RICO claims, those claims will be dismissed as to that Plaintiff(s).

S.Ct. 2524, 2528–29, 69 L.Ed.2d 246 (1981)). "Wholly unlawful enterprises fall within RICO's provisions." *Webster v. Omnitrition Intern., Inc.,* 79 F.3d 776, 787 (9th Cir.1996), *petition for cert. filed,* 65 U.S.L.W. (U.S. July 16, 1996) (No. 96–82). In addition, for liability to attach to individual defendants, plaintiff must show that the individuals participated in the operation or management of the enterprise which requires that the defendant have "some part in directing the enterprise's affairs" for RICO liability to attach. *Reves v. Ernst & Young,* 507 U.S. 170, 179, 185, 113 S.Ct. 1163, 1170, 1173, 122 L.Ed.2d 525 (1993).

The Ninth Circuit in *Chang v. Chen,* 80 F.3d 1293 (9th Cir.1996), recently discussed the minimal requirements to show an enterprise under RICO. A RICO enterprise must exhibit some sort of decision-making structure, and some on-going means of controlling and directing the affairs of the associated group. *Id.* at 1299 (quoting *United States v. Riccobene,* 709 F.2d 214, 222 (3d Cir.1983), *cert. denied,* 464 U.S. 849, 104 S.Ct. 157, 78 L.Ed.2d 145 (1983)). However, it "is not necessary to show that the organization 'has some function wholly unrelated to the racketeering activity.'" *Id.* (quoting *Riccobene,* 709 F.2d at 223–24); *see also United States v. Rogers,* 89 F.3d 1326, 1337 (7th Cir.1996) ("it would be nonsensical to require proof that an enterprise had purposes or goals separate and apart from the pattern of racketeering activity"). "Rather, it is sufficient to show that the organization has an existence beyond that which is merely necessary to commit the predicate acts of racketeering." *Id.* (citing *Riccobene,* 709 F.2d at 224). Therefore, the enterprise's only purpose may be to pursue the racketeering activity of its members, but the "enterprise" must not be one and the same as the "pattern of racketeering." [32] *See Chang,* 80 F.3d at 1300 (dismissing RICO claim, in part, because plaintiffs failed to allege "a structure to the organization beyond that which was inherent in the alleged acts of racketeering activity").

In the present action, the "enterprise" element of RICO is easily satisfied because ACLA exists as a distinct legal entity. ACLA is a national organization composed of individuals who allegedly endorse violence and intimidation as a means of furthering their anti-abortion message. Compl. ¶ 17. All the Individual Defendants have been or are affiliated with ACLA, but ACLA's membership extends beyond the Individual Defendants. Compl. ¶¶ 17, 19–32. ACLA holds various conferences which involve ACLA members from around the nation. Compl. ¶¶ 40, 47. ACLA published and disseminated the Deadly Dozen List which contains ACLA's name and address on the bottom of the list. Compl., Ex. A. Moreover, ACLA published numerous other "wanted"-style posters. Based upon these allegations and the logical inferences, Defendants' suggestion that ACLA does not exist as an anti-abortion organization separate and distinct from the pattern of racketeering activity is absurd. Accordingly, I find that Plaintiffs have satisfied the "enterprise" element of their RICO claims.

In addition, Plaintiffs' allegations support the conclusion that almost all of the Individual Defendants had some part in the operation and management of ACLA, the RICO enterprise. *See Reves,* 507 U.S. 170, 179, 113 S.Ct. 1163, 1170 ("the word 'participate' makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs, just as the phrase 'directly or indirectly' makes clear that RICO liability is not limited to those with a formal position in the enterprise, but *some* part in directing the enterprise's affairs is required"). Plaintiffs state that Defendants Burnett, Crane, Dreste, Dodds, Mears, Miller, Murch, Stover, Treshman, and Wysong are, or were, Directors of ACLA during the relevant time period and agreed to publish and disseminate the Deadly Dozen List and other "unwanted"-style posters. Compl. ¶¶ 20–23, 26–28, 30–32, 96. Furthermore, Defendants ALM, Foreman, McMillian, and Ramey all are members of ACLA and allegedly marketed and distributed ACLA publi-

---

**32.** Contrary to Defendants' assertions, the enterprise need not have an economic motive. *Schei-* *dler,* 510 U.S. 249, 259–62, 114 S.Ct. 798, 805–06.

cations and other statements threatening the use of force against plaintiffs. Compl. ¶¶ 18, 24–25, 29. I find that Plaintiffs sufficiently allege that these Defendants participated in the operation and management of the RICO enterprise.

■ However, Defendant Bray is not a member of ACLA and has merely "attended ACLA meetings and * * * promoted ACLA's threatening message." Bray's statements promoting ACLA's anti-abortion message do not constitute participation in the "operation and management" of the enterprise. *See, e.g., Webster,* 79 F.3d 776, 789 (defendant's ministerial role in the enterprise and statements promoting the scheme did not constitute participation in the "operation or management" of the enterprise). Therefore, Plaintiffs' RICO and ORICO claims against only Defendant Bray are dismissed. Plaintiffs have alleged sufficient participation by every other Defendant.

## E. RICO Conspiracy

### 1. Arguments

Lastly, Defendants urge the Court to dismiss Plaintiffs' RICO conspiracy claims because no factual allegations suggest that Individual Defendants conspired and agreed to violate RICO. However, Plaintiffs argue that Defendants are involved in a conspiracy because each Individual Defendant, through their participation in the "enterprise," (*i.e.,* ACLA) allegedly agreed to violate a substantive RICO provision.

### 2. Analysis

■ Section 1962(d) of RICO prohibits "any person to conspire to violate any of the provisions of subsection (a), (b) or (c) of this section." 18 U.S.C. § 1962(d). " 'The essence of a RICO conspiracy is not an agreement to commit racketeering acts, but an *agreement* to conduct or participate in the affairs of an enterprise through a pattern of racketeering activity.' " *United States v. Blinder,* 10 F.3d 1468, 1477 (9th Cir.1993) (quoting *United States v. Brooklier,* 685 F.2d 1208, 1216 (9th Cir.1982), *cert. denied,* 459 U.S. 1206, 103 S.Ct. 1194, 1195, 75 L.Ed.2d 439 (1983)). A RICO conspiracy does not require that each co-conspirator knows all of the details of the plan or conspiracy. *Baumer v. Pachl,* 8 F.3d 1341, 1347 (9th Cir. 1993) (dismissed RICO conspiracy claim because no allegations suggested assent to contribute to a common enterprise) (quoting *Brooklier,* 685 F.2d at 1222). Moreover, a co-conspirator need not participate personally in two predicate act offenses. *Blinder,* 10 F.3d at 1477.

■ Plaintiffs have alleged that "[e]ach defendant agreed with some or all of the other defendants to conduct or participate in the operation, conduct or management of the affairs of ACLA through a pattern of racketeering activity [and] [e]ach defendant further agreed to the commission of two or more predicate acts through which each defendant—as agent of the other defendants and co-conspirators—would conduct or participate in the operation, conduct or management of ACLA's affairs in violation of 18 U.S.C. § 1962(d)." Compl. ¶ 102. These allegations adequately support Plaintiffs' conspiracy claim. At this stage of the litigation I may not resolve the issue of whether all Defendants, in fact, agreed to participate in the management of the enterprise to commit racketeering activity. *See, e.g., Webster,* 79 F.3d 776, 789 (determining on summary judgment that plaintiff produced no evidence showing that defendants conspired to violate RICO). Plaintiffs have met their initial pleading burden by providing fair notice to Defendants of their RICO conspiracy against Defendants.

In sum, Plaintiffs have alleged sufficient facts to support their RICO and ORICO claims, as well as their RICO and ORICO conspiracy claims. However, Plaintiffs' allegations regarding Defendant Bray's involvement in ACLA, the RICO enterprise, show that he did not "participate" in the operation and management of ACLA; thus, all RICO and ORICO claims against Defendant Bray are DISMISSED.

## V. Intentional Infliction Of Emotional Distress

### A. Defendants' Arguments

Defendants contend, as a matter of law, that Plaintiffs cannot recover for intentional

infliction of emotional distress caused by either the dissemination of true information or Defendants' lawful exercise of constitutionally protected speech. Furthermore, Plaintiffs fail to allege specific facts showing that Defendants directed conduct towards Plaintiffs which extended beyond the farthest reaches of socially tolerable behavior.

## B. Plaintiffs' Arguments

Plaintiffs argue that they may recover on a claim for intentional infliction of emotional distress regardless of whether Defendants are disseminating true information or exercising their constitutional right to free speech. Moreover, whether Defendants' conduct exceeded the bounds of socially tolerable conduct is an issue of fact for the jury.

## C. Analysis

 To state a claim for intentional infliction of emotional distress, Plaintiffs must allege the following:

(1) defendant intended to inflict severe emotional distress on the plaintiff,

(2) the defendant's acts were the cause of the plaintiffs severe emotional distress, and

(3) the defendant's acts constitute an extraordinary transgression of the bounds of socially tolerable conduct.

*Madani v. Kendall Ford, Inc.,* 312 Or. 198, 203, 818 P.2d 930 (1991) (citation omitted) (court dismissed plaintiff's claim for intentional infliction of emotional distress where employer fired plaintiff for refusing to pull down his pants at employer's request). The "intent" element of the tort is satisfied where "'the actor desires to inflict severe emotional distress, and also where he knows that such distress is certain, or substantially certain, to result from his conduct.'" *McGanty v. Staudenraus,* 321 Or. 532, 550, 901 P.2d 841 (1995) (reversed the trial court's dismissal of plaintiff's claim for intentional infliction of emotional distress based on defendant's course of conduct constituting sexual harassment, such as unwelcome sexual advances,

comments, and physical conduct directed towards plaintiff) (quoting comment i of the Restatement (Second) of Torts § 46 (1965)).

 In considering whether the defendant's acts were an extraordinary transgression of the bounds of socially tolerable behavior, the key focus is "on the purpose and the means used to achieve it." *Patton v. J.C. Penney Co.,* 301 Or. 117, 123, 719 P.2d 854 (1986) (court dismissed employee's complaint alleging that employer intentionally inflicted emotional distress by discharging the employee because he was socializing with a co-worker). The conduct must be deliberate and the means of inflicting the harm must be extraordinary:

> "[t]he additional requirement that defendant's means of inflicting the injury must have been extraordinary is explained as necessary, first, to distinguish actionable conduct from insults, ill temper, and offensive jokes that persons are expected to endure under contemporary standards of behavior, and second, to provide a setting of objective reality for a claim of harm that otherwise rests only on evidence of the plaintiff's subjective reaction divorced from physiological or other tangible injury."

*Id.* at 123, 719 P.2d 854 (quoting *Brewer v. Erwin,* 287 Or. 435, 457, 600 P.2d 398 (1979)) (submitted issue of outrageousness to the jury where defendant attempted to frighten or bully plaintiff out of her apartment by particularly obnoxious means: disconnecting utilities, using physical violence and threats of violence, and demolishing the building under her feet). "The tort does not provide recovery for the kind of temporary annoyance or injured feelings that result from friction and rudeness among people in day-to-day life." *Shay v. Paulson,* 131 Or.App. 270, 884 P.2d 870 (1994) (court dismissed complaint alleging that defendant intentionally inflicted emotional distress by forging plaintiff's name on magazine order forms).

Moreover, the court will only consider acts which have occurred within two years from the date the complaint was filed.[33] *Richer v.*

---

33. As stated above, the Court interpreted the Complaint as attacking only the Deadly Dozen List and the Crist poster, with all other expres-

sions providing factual context. Both the Deadly Dozen List and the Crist poster occurred within 2 years from October 26, 1995, the date this

*Poisson,* 137 Or.App. 157, 160–61, 903 P.2d 932 (1995) (concluding that plaintiffs stated a claim for intentional infliction of emotional distress by alleging that, defendant, for the purpose of causing plaintiffs' emotional distress, painted graffiti on their windows, harassed them by telephone and harassed their customers by making obscene gestures) (citing ORS 12.110(1)).

 In the present action, Plaintiffs allege that Defendants published and disseminated posters, which threatened physical harm to Plaintiffs, with specific intent to inflict severe mental and emotional distress upon plaintiffs. Compl. ¶ 119. Furthermore, the dissemination of these threatening posters exceeds the bounds of socially tolerable conduct and has caused Plaintiffs to suffer severe mental and emotional distress. Compl. ¶¶ 120–21. The Complaint also contains significant background regarding the potential violent effect of Defendants' posters, such as murder, attempted murder, and assault of the individuals targeted in the posters. Compl. ¶¶ 50–80. Based upon these allegations, I cannot hold as a matter of law that Defendants' alleged threatening conduct does not exceed the bounds of socially tolerable conduct. Accordingly, Plaintiffs have stated a claim for intentional infliction of emotional distress.[34]

## VI. Punitive Damages

 As Defendants correctly state, Article I, section 8, of the Oregon Constitution prohibits punitive damages for injuries resulting from an abuse of protected expression. *Huffman,* 317 Or. at 457, 857 P.2d 101 (punitive damages were properly awarded for trespassing which was non-expressive conduct); *Lewis v. Oregon Beauty Supply Co.,* 302 Or. 616, 629, 733 P.2d 430 (1987) (on a claim for intentional infliction of emotional distress, the court allowed punitive damages for the non-communicable conduct but prohibited punitives for the communicable conduct); *Hall v. May Dept. Stores,* 292 Or. 131, 146–47, 637 P.2d 126 (1981) (court held that plaintiff could not receive punitive damages on claim for intentional infliction of emotional distress where the tortious conduct (*i.e.,* falsely accusing plaintiff of stealing and oppressively interrogating her) consisted only of expression). Conversely, the Oregon Constitution does not bar recovery of punitive damages or criminal liability for unprotected expression. *See, e.g., State v. Moyle,* 299 Or. 691, 699–704, 705 P.2d 740 (1985) (noting the similarity between criminal liability and punitive damages, and holding that criminal harassment statute did not violate Article I, Section 8, because it prohibited threats to cause serious injury to that person); *see also Stone,* 84 Or.App. at 578, 735 P.2d 7 ("a demand coupled with a threat of unlawful injury to specific persons or property enjoys no constitutional protection if it is objectively believable that the threat will be carried out if the demand is not complied with").[35]

Oregon law is not entirely clear as to whether Plaintiffs may receive punitive damages for injuries caused by Defendants'

---

action was filed. Other "wanted"-style posters were disseminated more than two years before the filing of the Complaint but may be relevant to provide context to the potentially actionable threats.

**34.** In so holding, I reject Defendants' suggestion that they cannot be held liable for the tortious effects of their expression, absent a specific privilege, merely because they are exercising their constitutional right to speech. If Defendants' assertions were true, a victim of defamation could never sue the perpetrator because the offense necessarily involves the exercise of one's right to speech. *See Huffman and Wright Logging Co. v. Wade,* 317 Or. 445, 453, 857 P.2d 101 (1993) ("The content of speech or writing is an element of the tort of defamation;" thus, only compensatory and not punitive damages may be

awarded). Moreover, the truthfulness or falsity of the content of Defendants' expressive conduct is irrelevant with regard to the tort of intentional infliction of emotional distress. Rather, the expressive conduct need only be outrageous in the extreme, regardless of whether the content of the communications is true or false. *Id.* at 455, 857 P.2d 101 ("The content of speech is not an element of the tort[] * * * of intentional infliction of emotional distress * * *." Rather, the tort of intentional infliction of emotional distress focuses on the "forbidden effects but expressly prohibit[s] expression to achieve those effects").

**35.** Likewise, as extensively discussed above, the First Amendment to the United States Constitution also does not protect "true threats" of serious physical harm. *See* discussion in Part II.C. of this Opinion.

alleged conduct in this case. However, if the facts demonstrate that Defendants' expression does not constitute a threat of serious physical harm toward Plaintiffs, that expression may be protected under Article I, Section 8, of the Oregon Constitution, as well as the First Amendment of the United States Constitution. In that event, punitive damages for intentional infliction of emotional distress caused by Defendants' expression would be barred.[36] However, because Plaintiffs allege that Defendants' expression constitutes threats of serious physical harm towards Plaintiffs, Plaintiffs may allege punitive damages for all claims.[37] I decline to reach a decision on this matter at this juncture.

## CONCLUSION

For the reasons discussed above, Defendants' Motion to Dismiss Plaintiffs' Complaint (# 103, # 104, # 112) are DENIED. Defendant ACLA's Motion for Judgment on the Pleadings (# 114) is DENIED IN PART and GRANTED IN PART as follows: All RICO and ORICO claims against Defendant Bray are DISMISSED.[38]

Plaintiffs are given LEAVE TO AMEND their Complaint to clearly distinguish between the allegedly actionable and the contextual expressions, as well as to specifically name the individual Defendants who intended to further the alleged threats of violence.

IT IS SO ORDERED.[39]

---

**36.** As to the other causes of action, if the facts show that Defendants' expressions are not "true threats," most of Plaintiffs' federal and state claims would likely extinguish and this issue would become moot.

**37.** Plaintiffs may seek punitive damages on all other claims, so long as the damages are awarded for violation of the statute, and not for the content of the speech.

**38.** The inclusion of factual matters outside the pleadings ordinarily requires Rule 12 motions to be treated as a Rule 56 motion for summary judgment, see Fed.R.Civ.P. 12(b); see also Wil-

liam W. Schwarzer, A. Wallace Tashima, James M. Wagstaffe, Federal Civil Procedure Before Trial, § 9:198 (1996), but at least some discovery must be completed before a motion for summary judgment should even be considered in this case. See Fed.R.Civ.P. 56(f).

**39.** I emphasize that this decision is made in a FRCP 12(b)(6) setting where all allegations in the Complaint must be accepted as true. The Court will be reevaluating Plaintiffs' claims with great scrutiny after further discovery has been undertaken and the case is ripe for summary judgment.